# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 5, 2014 Session

## STATE OF TENNESSEE v. FREDERICK HERRON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 1104122     Carolyn W. Blackett, Judge**

---

**No. W2012-01195-SC-R11-CD - Filed March 26, 2015**

---

The defendant was charged with and convicted of rape of a child, and he received a twenty-five-year sentence. The defendant appealed, raising seven issues. The Court of Criminal Appeals held that the trial court erred by (1) allowing the prosecution to introduce the child's prior consistent statement, a recorded forensic interview, during its case-in-chief before the child's credibility had been challenged; and (2) ruling that if the defendant chose to testify the prosecution would be permitted to ask him whether he had been previously arrested or convicted of an unnamed felony. Nevertheless, in a divided decision, two judges of the Court of Criminal Appeals concluded that these errors were neither individually nor cumulatively prejudicial. The dissenting judge opined that the second error alone was prejudicial and entitled the defendant to a new trial. We affirm the Court of Criminal Appeals' conclusions that the evidence is sufficient to support the conviction and that the election is sufficiently specific and definite. We hold that the cumulative effect of the two conceded trial errors is prejudicial and entitles the defendant to a new trial. Because of the remand for a new trial, we do not address the defendant's other allegations of evidentiary errors. Accordingly, the judgment of the Court of Criminal Appeals is reversed in part; the defendant's conviction is vacated; and this matter is remanded to the trial court for a new trial, consistent with this decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed in Part; Conviction Vacated; Case Remanded for a New Trial**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and GARY R. WADE, and HOLLY KIRBY, JJ., joined. JEFFREY S. BIVINS, J., not participating.

Neil Umsted, Memphis, Tennessee, for the appellant, Frederick Herron.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terri Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

Daniel A. Horwitz, Nashville, Tennessee, for the amicus curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**I. Factual Background**

On June 28, 2011, a Shelby County Grand Jury returned a single count indictment charging the defendant, Frederick Herron, with rape of a child.[1] The indictment alleged that the rape occurred between July 1, 2002, and July 5, 2006, when the child, born October 14, 1994, was greater than three but less than thirteen years of age. The abuse was not reported to law enforcement authorities until September of 2010. The defendant's trial occurred from March 26 to March 30, 2012.

The child, who shall be referred to as MM,[2] was seventeen years old and in the eleventh grade at the time of trial. She had nineteen siblings, ranging in age from ten to forty-two years old.[3] When MM was six years old, she and eight of her siblings were removed from the custody of their biological mother because she abused drugs and neglected them. MM moved in with one of her unmarried adult sisters, Takyra Shields.[4] Ms. Shields had no children, so she and MM initially lived alone together in an apartment in Memphis.

---

[1] At present and at all times relevant to this case, rape of a child has been defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2014).

[2] It is the policy of this Court to identify minor victims in a way that protects their privacy.

[3] MM and five of her siblings had the same mother and father. MM shared either a paternal or a maternal connection with her other fourteen siblings.

[4] MM and Ms. Shields shared the same father. Although MM had seen her father, he had never been involved in her life and had not ever provided her any financial support.

Ms. Shields obtained legal custody of MM on July 13, 2001, shortly before MM turned seven. Toward the end of 2001, Ms. Shields met and began dating the defendant. The couple married on September 1, 2002, prior to MM's eighth birthday. MM's nephew, D.J., lived with them awhile and shared a bedroom with MM. After he moved out, his mother, MM's sister Treliesia, and her minor daughter lived with them for about two months and shared MM's bedroom. After they moved out, the household consisted of MM, the defendant, and Ms. Shields. The family moved frequently, about every eighteen months, causing MM to change schools often. MM recalled attending four or five different elementary schools.[5]

Unlike Ms. Shields, whom MM described as "always mean to [her]," the defendant was "always really nice to [her]," "bought [her] things," "treat[ed her] better than" Ms. Shields did, took "the time to talk to [her]" rather than "yell[]" at her, was not verbally abusive, and never cursed or talked down to her. According to MM, the defendant seemed to treat her as his own daughter, genuinely appeared to care for her, and had taken her to and from school more than anyone else in her "whole life." MM characterized the defendant as a "[n]ice, kind, caring," and "generous" person, on whom she had relied a great deal to supply her daily needs, such as food, clothing, shelter, and school supplies.

When asked about her first memory of the defendant behaving inappropriately toward her, MM described an incident that occurred after Ms. Shields had scolded her. MM had been walking upstairs toward her bedroom, crying, when the defendant, who was already upstairs in the master bedroom, called for her to come into his room. MM complied. The master bedroom was dark when she went inside, and the defendant was seated on the side of the bed opposite the door, dressed in his boxer shorts, with his pants around his ankles. MM stood between the defendant's legs, with her back towards him, and his legs touching either side of her body. With his hands, the defendant rubbed MM "on [her] back and kind of like on [her] stomach and like down [her] leg a little bit." As he touched her, the defendant asked MM, "Are you my baby?" When she responded, "I don't know," the defendant replied, "What do you mean you don't know? Either you is or either you ain't my baby." MM replied, "I don't know–I guess." About this time, Ms. Shields ascended the stairs, and the defendant told MM she could go. As MM was leaving, Ms. Shields stopped her and asked why she had been in the master bedroom with the defendant and if the defendant's pants were down. MM told Ms. Shields that the defendant had called her into the room and that, although his pants were down, he was wearing his boxer shorts. Ms. Shields replied, "Okay," asked no more questions, and allowed MM to go to her own room.

---

[5] MM's frequent moves continued, as evidenced by her testimony that she attended three different middle schools and three different high schools.

MM recalled thinking that the defendant's behavior was "real weird," but she did not mention the incident to anyone, aside from her responses to Ms. Shields's questions.

When asked how far the defendant's touching had gone, MM testified that, beginning when she was in second grade and seven years old, the defendant came into her bedroom "all the time," "always" at night, and on each occasion, he "would always go to the bottom of [her] bed, and he would, like, fling the covers back, and he would start moving [her] legs to like try to get in between [her] legs" and "do[] what he wanted." MM testified that if she were lying on her side or stomach, the defendant would turn her onto her back, move her legs apart, pull down her pants and underwear, and "hav[e] sex with [her]." MM explained that by this term she meant the defendant would penetrate her vagina with his penis. MM had tried to "keep [her] legs closed" and would "clench up so he couldn't move [her]." Although MM could not recall the defendant touching her with his hands, she remembered him "breathing on [her]," and she stated that his breath smelled of beer "[j]ust about every time." MM was unsure whether the defendant ejaculated inside her vagina, but she recalled sometimes feeling a "wet," "sticky" substance on her bed and thigh. MM testified that the defendant never spoke during these episodes, which "never really stopped until fifth grade." Although MM was awake during these assaults, she ordinarily feigned sleep.

MM also testified about an incident that occurred when her cousin, Keyla Walker, who was visiting from out of town, spent the night with her. After the girls were in bed but before they were asleep, a person entered the room, walked to the foot of the bed, lifted the covers, and tried to get into bed with them. The girls did not scream or call out for help, but at Ms. Walker's suggestion, they "started kicking" their feet, and the intruder ran from the room. As he left, MM realized it was the defendant and that he was naked. MM remarked to Ms. Walker that this was not the first time the defendant had come into her room. Neither Ms. Walker nor MM told an adult about the incident. Ms. Walker left the next day and never spent the night at MM's home again when the defendant was present.

MM acknowledged, however, that the defendant had not assaulted her every night. Except for the incident involving Ms. Walker, the defendant had not entered her room when other family or friends were staying with them. MM also could not recall the defendant assaulting her before he and Ms. Shields married, or while the family lived in a loft-style apartment when MM was in second or third grade, or during the marriage when the defendant and Ms. Shields were separated.

The abuse ended, MM explained, when she confronted the defendant. This confrontation occurred, according to MM, when the defendant entered her bedroom around 2:00 or 3:00 a.m. on July 4th of the summer after she had completed fifth grade, while the family was living "[o]n Hacks Cross." After the defendant moved her legs apart and

removed her pants on this occasion, MM asked him why was he on top of her. The defendant replied, "What?" MM repeated the question, and the defendant stood and asked, "What do you mean?" MM again repeated the question, but the defendant "just started talking about other stuff." When MM picked up a cigarette lighter and stated, "Well, how about I just burn you," the defendant "snatched" the lighter from her and admonished her for "playing" with it. MM left her bedroom and went into the living room, but the defendant followed her. When MM told him that she was "going to go tell" Ms. Shields about the abuse, he asked if she wanted "to mess with [his] marriage." When MM replied, "No," the defendant stated, "Well, if you don't want to mess with my marriage, you won't say anything." MM returned to her bedroom without responding and lay face down on the bed. The defendant came back into her room and licked her leg. MM again confronted him, asking, "Why did you just do that?" The defendant left her room without responding. A short time later, he returned and told her that he and D.J., who had spent the night in the guest room, were going outside to "pop firecrackers." MM went with them but "stayed in the background" as they "started popping firecrackers." When Ms. Shields awoke later and asked why they were up so early, the defendant replied, "We wanted to get a head start." Despite her earlier threat, MM did not tell Ms. Shields about the abuse or about the defendant entering her room that night. Despite her silence, the abuse ended that night. Nevertheless, MM estimated that the defendant raped her more than ten times while the family lived on Hacks Cross. According to MM, many of these assaults had occurred after the defendant and Ms. Shields had argued about his excessive drinking.

MM believed, based on questions Ms. Shields had asked her, that Ms. Shields either knew "what [the defendant] was doing to [her]" or "had suspicions" about the abuse. MM testified that on one occasion, the defendant entered her bedroom and was about to remove the covers and her pants, but suddenly ran from the room when Ms. Shields, normally a heavy sleeper, awoke. The next day, Ms. Shields asked MM if the defendant had been in her room. When MM replied, "Yes," and remarked that the defendant "had done something" to her, Ms. Shields "told [MM] to keep a fork or a knife under [her] pillow; and if anybody else came back in [her] room, to stick them with it." MM testified that she had never felt that Ms. Shields loved her and that Ms. Shields yelled at her "all the time" and "thr[e]w it in [her] face" that she was not living with her mother anymore. MM also described getting into "trouble" with Ms. Shields for "things [she] didn't do" and things Ms. Shields knew she "didn't do." MM agreed that she had been "hurt" and "angered" by Ms. Shields's conduct toward her. MM also recalled being "real[ly] angry" with Ms. Shields for not doing anything to stop the abuse. MM testified that, even after she told Ms. Shields the defendant had done something to her, he had remained in the household and had continued raping her.

MM testified that the defendant and Ms. Shields separated when MM was in fifth grade.[6]  Although MM and Ms. Shields moved out, MM finished her fifth-grade year at the nearby elementary school.  Each morning, Ms. Shields dropped MM off at the defendant's home, and from there, she walked to school.  She also often returned to the defendant's home in the afternoon.  MM and the defendant talked regularly in the afternoons about the people who had hurt her, how she felt, and how she could feel better.  During one of these conversations, MM told the defendant that he, too, had hurt her.  The defendant appeared surprised and questioned her, saying, "Me?" and "Well, what did I do to you?"  When MM reminded him that he "used to . . . do things to [her]," the defendant asked whether she meant that he "used to put [him]self in [her]?"  MM answered, "Yes," and the defendant then asked if he had been drunk at the time.  When MM responded, "Yes, I guess so," and commented that he "used to drink," the defendant stated, "Well, I don't remember, but I'm sorry."

MM remained in contact with the defendant after he and Ms. Shields divorced, despite the sexual abuse, and she sometimes stayed at his home when she and Ms. Shields argued.  MM testified that the defendant never assaulted her when she stayed with him.  However, MM related that, on one of these occasions, she had gone to sleep alone on the living room floor, because the defendant had no furniture, and awoke the next morning with the defendant asleep behind her on the floor, dressed only in his boxer shorts, with his penis out of his boxers, "lying on the floor."  Seeing this, MM went to another room in the residence and asked the defendant to drive her home when he awoke later.

MM's arguments with Ms. Shields escalated, and Ms. Shields kicked her out of their shared home three times during MM's eighth grade year.  Each time, Ms. Shields called the defendant to come pick up MM.  MM lived with the defendant about a week the first time, and although it is not clear how long she stayed with the defendant the second time, MM said she had not wanted to return home.  On the third occasion, MM lived with the defendant about four months at the Autumnwood Apartments.  The defendant's girlfriend also lived with them for "a little bit of time" but accepted a job in Texas and moved there.  Although his girlfriend asked him to move with her to Texas, the defendant declined because MM did not want to leave Memphis.  MM agreed that, during the time she lived with him, the defendant drove her to and from school, paid for her school clothes, and provided her shelter and food.  MM had no contact with any of her adult siblings during this time.

MM remained at the defendant's home until he told her she could no longer live with him.  Because Ms. Shields also refused to allow MM to move back in with her, MM moved

_____

[6] This testimony is not consistent with MM's earlier testimony that the abuse did not occur after the couple separated but had continued through her fifth-grade year and ended only after she confronted the defendant on the July 4th following her fifth-grade year.

in with another of her adult sisters, Tacoma McCrary. MM remained in contact with the defendant after she moved, and he attended the juvenile court hearing a few months later at which Ms. McCrary obtained legal custody of MM. The juvenile judge directed the defendant to continue providing MM's health insurance coverage.

In April of 2010, while she was in ninth grade and living with Ms. McCrary, MM attempted suicide by taking an overdose of Lortab. MM testified that she had not truly wanted to end her life and had "just [been] thinking about, you know, everything that was happening and that [had] happened" and that "it just seemed like it was just one bad thing after another; and [she] was just tired of it." When the prosecutor asked MM to specify the things that had made her think she "might not want to live anymore," MM responded that it had been "[d]ealing with [Ms. Shields] and her—verbal abuse, physical abuse, and getting raped, and moving from home to home—different family members having to deal with, you know, different things—people dying in my family and stuff like that."

After the suicide attempt, MM received both in-patient and out-patient treatment at Lakeside, a local mental health facility, and her treatment was covered by the health insurance the defendant provided. The defendant visited her at Lakeside about three times. During these visits, the defendant questioned MM about what her caregivers had asked her and what she had told them. MM testified that she "kind of knew" the defendant was attempting to determine "if [she] had said anything" about the sexual abuse, "but [she] hadn't." MM did not tell the defendant that she had not disclosed the abuse to her Lakeside caregivers.

MM stopped having contact with the defendant after Ms. McCrary learned of the abuse and took MM, in September of 2010, to an office in downtown Memphis to speak with a counselor about it. MM testified that she had decided to tell the counselor about the abuse because Ms. McCrary and other family members were already aware of it. They learned of the abuse after MM's niece discovered her childhood diary, which contained an entry referring to the defendant raping MM from second to fifth grade. According to MM, her niece then showed the diary to Ms. Shields, who confronted MM about the abuse in the presence of several other family members, including at least one male and Ms. Walker. MM denied the abuse had occurred, so her family did not call the authorities at that time.

During her direct examination, MM authenticated the diary[7] and read the following portion of an entry she had written at 7:27, on October 4, 2006, ten days before her twelfth birthday:

> And another thing, [the defendant], AKA your bitch-ass ex-husband raped me from second grade until fifth–July 4th; and still tried to do it periodically; and the reason I said until July 4th was because that is when I confronted him. You remember when we were living in Hacks Cross—3913 Long Creek Road, at 4:00 A.M. that morning, and D.J. was in the guest room, and know—know this, [Ms. Walker] was the only person who knew until in the sixth grade when I finally told Ebony and Tonya.

MM acknowledged that the diary included only a single reference to the defendant raping her and that in another portion of the same diary entry, she had written, "I'm still a virgin." MM explained that she had considered herself to be a virgin in 2006, despite the rapes, because she had not wanted the rapes "to happen to [her]."

MM agreed too that her diary included more entries about her anger and resentment toward Ms. Shields than about the abuse or her feelings toward the defendant. MM admitted that she had also written in the diary of her desire to kill Ms. Shields by stabbing her in the heart. MM said that she had been angry with Ms. Shields and made no apologies for writing about her feelings at the time. MM explained that she had not expected to be reading her diary aloud at age seventeen to "strangers in a courtroom."

The counselor to whom MM disclosed the abuse contacted the police, and on November 23, 2010, MM provided information and answered questions about the abuse in a recorded forensic interview. MM watched the recording prior to testifying at trial, and after she authenticated the DVD, the trial court, over the defendant's objection, allowed the jury to view the recorded interview in its entirety.

Afterwards, MM resumed the witness stand. She acknowledged that her testimony at trial included many more details of the abuse than she had given during the November 23, 2010 forensic interview but explained that she had remembered more details after the interview. MM reiterated that she had remained in contact with, and even lived with, the

---

[7] Ms. McCrary produced the diary on the morning of trial. MM testified that, until the week of trial, she had not seen the diary for four or five years. When asked why some pages had been torn from the diary, MM explained that she had realized during her childhood that Ms. Shields was reading her diary and had then torn out any entries describing "what [she] was praying about" because her prayers for certain family members were very specific.

defendant after the divorce, because the defendant "was the only person that was actually taking care of [her]." MM said that her fear of having no one to care for her also caused her to keep silent about the abuse. MM said that she and Ms. McCrary had "problems of [their] own," and by the time of trial, MM was living with her biological mother instead of Ms. McCrary.

On cross-examination, defense counsel attempted to impeach MM's testimony that Ms. Shields had known of the abuse and done nothing to stop it. To that end, MM was asked to read her entire October 4, 2006 diary entry[8] into the trial record, and asked MM why, if

---

[8] Below is the trial transcription of MM's reading of her entire October 4, 2006 diary entry, revised as necessary to identify clearly the trial participants and to protect MM's privacy.

> Let me just lay some things out for right quick. Tomorrow, we getting report cards. I hate [Ms. Shields], as usual–usually. She lost her job, and Marcus broke up with her the same day, but I think they back together. I guess I'm still going with Brian. I don't know, really. I don't want to talk to her ugly anymore. Besides, a couple of Sundays ago, I'm on punishment until my birthday, which is October 14th, 2006, but ain't nothing special about that. [Ms. Shields] cancelled my birthday–bitch–I got in trouble for cursing for a good reason. I went to my cousin Edmond's (phonetic) cousin's house–my cousin Edm[o]nd's cousin's house, got in trouble again. Ebony was talking to this boy named Shawn, and I was out there, so I got in trouble too. And school is the best time of the day. A whole lot of people like me and trying to get with me. But I don't get the wrong idea. I'm still a virgin. [Ms. Shields] says I can't date, but she ain't my mama, so I still do. You know, I thought diaries was about privacy; but you know, [Ms. Shields], you just got to know everything. So, if you ever read my diary, just know this: I don't like you. You act like a bitch. You probably are one. I hope I hurt you physically and emotionally, you stink-ass whore. You know, I almost cried when I wrote this, but you don't care about my feelings or emotions, so fuck it. Just like one of the sayings, life is like–life is like–life is like (indiscernible). And another thing, Frederick Herron, AKA your bitch-ass ex-husband raped me from second grade until fifth–until fifth–fifth–July 4th and still tried to do it periodically. And the reason I said until July 4th was because that is when I confronted him. You remember when we were living in Hacks Cross, . . . Long Creek Road at 4:00 A.M. that morning, and D.J. was in the guest room; and know this, [Ms. Walker] was the only person who knew until, in the sixth grade, when I finally told Ebony and Tonya.
>
> You know, you make my life like hell. I try to suck it up, but I have too much pain. I've got to let something go. That is why I don't express myself. And, you know, when you say if I ever want to fight you, just–if I ever want to fight you, just say so. Well, do you know–say so. Well, do you know how many times–do you know how many times I've wanted–wanted to say something; but I say, "No. When I die, I want to go to heaven." But I can't say the same for you. And if I ever do fight you, don't think, for one second that you're going to win; because if I just–because if I just want to let it go by quickly–because if I just want to go by quickly, I won't hesitate to pick up a knife; and, while you sleep,–and while you sleep or not to stab you in the–I'm not going to stab–I'm not going to stab you in

-9-

Ms. Shields had already known of the abuse, did she write the diary entry in a manner that indicated she was informing Ms. Shields of the abuse for the first time. Defense counsel also highlighted statements MM made during the forensic interview indicating that Ms. Shields had not known of the abuse and that MM had not told her of it. MM denied being aware that Ms. Shields had been the victim of rape and could not recall Ms. Shields talking to her Girl Scouts troop about the importance of reporting sexual abuse. MM, an excellent student at the time of trial, acknowledged that her grades had improved after the defendant came into her life because he had helped her with reading. MM also agreed that the defendant had encouraged her academic performance and told her that, as long as she made him proud, he would continue to take care of her. MM confirmed that the defendant bought her school clothes and "everything" she needed and also gave her and her nephew Christmas and birthday gifts.

MM agreed that there were locks on her bedroom doors at all the places she lived with the defendant and Ms. Shields. Although she recalled locking her bedroom door a few times when they lived on Hacks Cross, she could not recall specific dates and also could not recall locking her door at any of the other places they had lived. MM reiterated that the defendant always arrived in her room nude and left nude, even though Ms. Shields was present in another bedroom of the house.

When defense counsel asked if she had ever had any bleeding after the defendant raped her, MM responded that she had started bleeding on one occasion and did not know why and thought it was caused by the abuse. MM had tried to hide her clothing, but Ms. Shields saw the blood while doing laundry and told MM the bleeding meant that she had started her menstrual period.

MM explained that she had not told Ms. Shields about the abuse after the divorce because Ms. Shields had previously done nothing to stop it. MM agreed that she had denied

---

your head, back, arm, or leg; but right smack dab in your heart; and if you really want to know, I've been cursing since I was three. [Ms. McCrary] said herself my first cursing words was "Bitch."

And don't you ever put my mama name in your mouth. I don't care if you think you saying something nice. Don't you think I know my mama was on crack and we got split up; and the people came to your door. I was just trying to forget–forget that, but people like you make it hard for people like me to forget easily. –sad face– So, if you ever read this, now you know how I feel, and I have finally expressed myself.

From the one and only, mother-fucking, [MM]–fuck all you bitches.

the abuse when questioned by family members about it during the two years preceding trial. MM denied that Ms. Walker had tried to convince her to disclose the abuse.

MM agreed that Ms. McCrary, who retained legal custody of her, no longer provided for her financially. Even when she lived with Ms. McCrary, MM recalled having "always" to remind Ms. McCrary to provide for her needs. MM agreed that she had been "scared" about how she would "get by" when she attempted suicide in April of 2010.

On redirect examination, MM authenticated her fifth grade report card, dated May 26, 2006. MM confirmed her prior testimony that the July 4th confrontation occurred in 2006 and that neither Ms. Shields nor any other of her paternal relatives had contacted her since she reported the abuse, and that none of them were attending the trial in support of her. MM denied imagining or making up the abuse and said she had nothing to gain from testifying about it at trial. When asked if she thought the defendant gave her things after the divorce—such as a cell phone, the insurance coverage, money, clothing, and gifts—to buy her silence, MM replied, "Yes." When asked if she thought the defendant gave her those things because he genuinely cared about her, MM replied, "Maybe."

On recross, MM stated that she was "certain" the July 4th incident occurred during the summer of 2006, between her fifth-grade and sixth-grade years. Despite her earlier testimony, MM agreed that she had seen Ms. Shields at least twice since reporting the abuse—once at a family funeral and once at a wedding.

At the end of recross, the State announced that it had no further questions for MM; however the following day, the State recalled her to the stand. MM then testified that the defendant penetrated her vagina with his penis the night before she menstruated for the first time at the age of nine. MM turned nine on October 14, 2003.

Testifying next for the prosecution, Ms. Walker, twenty-two years old at the time of trial, described an incident that occurred when she was thirteen and had spent the night with MM. This incident occurred when Ms. Walker came to Memphis from Illinois with her parents to visit relatives around Christmas of 2003. Ms. Walker, who had a "funny feeling" about the defendant at the time because he was "too nice," asked MM if the defendant had touched her. MM nodded her head and said, "Yeah." As they were talking about him, the girls heard the bedroom door open and "kind of put the covers over [them]." But Ms. Walker, who was on the right side of the bed, could still see and observed the defendant enter the bedroom "butt naked," go to the foot of the bed, lift the covers, and try to grab MM's legs. Ms. Walker then kicked her legs for "like a minute," and the defendant "ran" from the room. Although the incident scared her, Ms. Walker did not scream or tell Ms. Shields, explaining that she was "kind of shocked." According to Ms. Walker, she encouraged MM,

whom Ms. Walker recalled as being seven at the time,[9] to tell Ms. Shields, but MM had looked scared and shook her head "no." Ms. Walker told her own parents about the incident after they returned home to Illinois.

Ms. Walker moved to Tennessee in 2009 to attend college. Learning that MM planned to live with the defendant, she became concerned and tried to convince MM to disclose the abuse to Ms. Shields. That same year, 2009, Ms. Walker showed MM's October 4, 2006 diary entry to Ms. Shields. According to Ms. Walker, Ms. Shields read the diary entry but did not seem shocked and remarked to MM, "I told you to sleep with a fork under your pillow."

Ms. McCrary testified as the State's final witness. Ms. McCrary had filed a petition to obtain legal custody of MM in 2009, after the defendant called and told her that MM could no longer stay with him. Before he called, Ms. McCrary did not know MM was living with the defendant. After MM moved in with Ms. McCrary, the defendant continued providing financial assistance for MM and calling and visiting her. According to Ms. McCrary, the defendant spoiled MM and bought her things that "she didn't deserve" and had not earned, to the point that "it was getting weird," so Ms. McCrary told him to stop. On cross-examination, Ms. McCrary agreed that MM became upset when the defendant stopped buying her gifts.

Ms. McCrary testified that she had suspected the defendant of abusing MM as early as 2005, after Ms. Shields told Ms. McCrary of her own suspicions. According to Ms. McCrary, Ms. Shields told her about discovering the defendant in MM's bedroom with the door locked. Ms. Shields "shov[ed]" on the locked door for a minute or two before the defendant emerged and claimed to have been turning off MM's television. Ms. McCrary stated that the memory of this incident had "flashed back into [her] mind" when she learned that MM had been living with the defendant. Although she had never witnessed any abuse while MM lived with the defendant and Ms. Shields, Ms. McCrary described MM as always appearing sad and never wanting Ms. McCrary to leave when she visited.

MM told Ms. McCrary of the abuse at some point after her suicide attempt in April of 2010. Sometime later, Ms. McCrary saw MM's diary entry about the abuse. Ms. McCrary learned of the diary from Ms. Walker, not MM, and Ms. Walker, not MM, also told Ms. McCrary about the defendant entering MM's bedroom nude when they were children. Ms. McCrary confirmed that she had turned over MM's unaltered diary to the prosecution not long before the defendant's trial began.

---

[9] In December of 2003, MM would have been nine, as she was born October 14, 1994.

On cross-examination, Ms. McCrary agreed that the defendant had driven MM to school for a few days, explaining that her boyfriend's car, which she had been using, was unavailable because she had slashed three of its tires. The defendant had known MM needed a ride because, "at that point in time," he was paying Ms. McCrary to drive him to "his DUI classes or something." The defense objected to Ms. McCrary's testimony about the defendant's DUI classes as non-responsive, but the trial court overruled the objection.

On redirect, Ms. McCrary clarified that she had only driven the defendant to DUI classes for about "a week or something." Ms. McCrary acknowledged that she had taken away the cell phone the defendant gave MM, because MM "was having some attitude problems." Ms. McCrary testified that the defendant allowed her to keep the phone, but when "[she] started looking through the phone," she "found things that shouldn't have been in there, and that's when things started to get weird."

After Ms. McCrary testified, the State rested its case-in-chief and announced its election of offenses, choosing as the basis for conviction on the single charge of rape of a child MM's testimony that the defendant vaginally raped her the night before the onset of her first menstrual period.

The defense then called Ms. Shields to testify. Ms. Shields, an assistant teacher at the time of trial, testified that she and MM were not living with the defendant on July 4, 2006, the date MM testified that she confronted him about the abuse. According to Ms. Shields, the couple separated on December 25, 2005, and did not live together again. After they separated, Ms. Shields had continued to drop MM off at the defendant's residence until her fifth-grade year ended in May of 2006. But, Ms. Shields reiterated, the defendant was not around MM on July 4, 2006. Sometime after their divorce became final on July 23, 2007, the defendant started again having contact with MM and providing financial support for her. According to Ms. Shields, as part of their divorce, she and the defendant verbally agreed that she would not seek alimony as long as the defendant provided for MM. According to Ms. Shields, MM called the defendant after the divorce whenever she "got an attitude" or needed something for school, such as clothing or money for extracurricular activities.

Ms. Shields denied ever seeing the defendant walk around nude when they all lived together or discovering the defendant inside MM's bedroom with the door locked. Ms. Shields also denied ever telling MM to sleep with a fork and knife under her pillow, or expressing concern to Ms. McCrary about the defendant's and MM's relationship, or suspecting the defendant of sexually abusing MM. Furthermore, Ms. Shields denied ever seeing MM leave the master bedroom when the defendant was inside dressed only in his boxer shorts or questioning MM about the defendant's pants being up or down. According to Ms. Shields, MM neither told her the defendant was touching her inappropriately nor

expressed fear of the defendant. Had she been aware of any sexual abuse, Ms. Shields stated that she would have reported it, having herself been a victim of sexual abuse. Ms. Shields related that, while serving as leader of MM's Girl Scout troop, she had encouraged all the girls to report sexual abuse.

Ms. Shields acknowledged, however, that the defendant drank "beer all the time" and would sometimes drink "before bedtime," and that his drinking "sometimes," but not often, affected his behavior. Ms. Shields agreed as well that she sleeps very soundly and that the defendant possibly could have left their bedroom, entered MM's bedroom, and returned without waking her. Ms. Shields also agreed that it would not have been unusual for the defendant to go into MM's bedroom to turn off the television, because MM slept with it on. Nevertheless, Ms. Shields stated her belief that the defendant had not abused MM and had acted as a father figure to her.

Ms. Shields agreed that she had been a disciplinarian with MM—not allowing her to wear certain clothes, requiring her to maintain good grades, and not allowing her to associate with certain friends. When MM violated these rules, Ms. Shields disciplined her, either by taking away her cell phone or grounding her. Ms. Shields admitted that she had verbally abused MM on occasion, explaining that when she was "mad enough," she probably said "anything to [MM]." She also acknowledged kicking MM out of her house when MM was fourteen and allowing her to stay with the defendant until MM moved in with Ms. McCrary. Regardless, Ms. Shields professed to love MM "to death," as if MM were her own child. Ms. Shields learned of MM's suicide attempt from the defendant, who called and asked why she was not present at Lakeside. By the time he called, MM had been hospitalized at the facility for about two weeks, and Ms. McCrary had not called her.

Although Ms. Shields admitted that she had not spoken with MM about the abuse since the allegations were made, she described her relationship with MM at the time of trial as "fine." Ms. Shields agreed that she, MM, and their sister Treliesia had always talked openly about "sexual conversation." Ms. Shields confirmed that MM had her first menstrual period at age nine.

When shown MM's diary, Ms. Shields identified the handwriting as belonging to MM, but she denied ever seeing the diary prior to trial. Ms. Shields acknowledged that, in May of 2009, Ms. Walker had told her of the diary entry in which MM expressed a desire to kill her. About this same time, Ms. Walker also told Ms. Shields that the defendant had "tried to pull out the bed one time" when Ms. Walker spent the night with MM. As a result, Ms. Shields called MM into the room and asked her three times in the presence of other family members whether the defendant had ever touched her. According to Ms. Shields, MM

denied the abuse and stated that "she wished people would stop asking her that." Based on MM's denial, Ms. Shields did not report the abuse.

Ms. Shields, who had not parted company with the defendant on the best of terms, stated that she was not testifying to help the defendant but was testifying to the truth.

Ms. Shields was the only defense witness. The defendant chose not to testify in his own behalf after the trial court ruled that, if he did so, the prosecution would be allowed to ask him about prior arrests and felony convictions. The defendant also sought to introduce as evidence a letter MM had written to Ms. Shields in 2009, in which MM described herself as a virgin, but the trial court refused to admit the letter.

The prosecution then recalled Ms. Walker and Ms. McCrary to the stand as rebuttal witnesses. Ms. Walker reiterated her earlier testimony that in 2009, she had witnessed Ms. Shields read MM's diary entry referencing the defendant raping her. According to Ms. Walker, this was the same day Ms. Shields asked MM about the abuse. Ms. McCrary reiterated her earlier testimony that Ms. Shields had suspected the defendant of "doing something to [MM]."

At the conclusion of the proof, the trial court instructed the jury, and the jury began its deliberations. After deliberating about three hours, the jury asked to see MM's recorded forensic interview again, and the trial court granted this request, bringing the jury into open court to play the DVD. About two hours after resuming its deliberations, the jury rendered its verdict, finding the defendant guilty of the charged offense of rape of a child. At a separate sentencing hearing, conducted about a month later, the trial court imposed a twenty-five-year sentence.

The defendant appealed, raising the following issues: (1) the trial court abused its discretion by allowing the prosecution to play a recording of MM's entire forensic interview during its case-in-chief; (2) the trial court abused its discretion by ruling that the prosecutor would be allowed to question the defendant about prior arrests and an unnamed prior felony conviction if the defendant chose to testify; (3) the State's election of the offense failed to ensure a unanimous verdict because the election referred to an offense that occurred on an unspecified date; (4) even if the election was sufficient, the evidence was insufficient to support the conviction; (5) the trial court erred by refusing to take corrective action when a prosecution witness referred to the defendant's DUI conviction in a non-responsive answer to questioning by defense counsel; (6) the trial court abused its discretion by excluding a letter MM had written to Ms. Shields; and (7) the cumulative effect of these errors deprived the defendant of a fair trial.

The State conceded that the trial court erred with respect to the first two issues but argued that these errors were neither individually nor cumulatively prejudicial and asserted that the remaining allegations of error lacked merit. A majority of the three-judge panel of the Court of Criminal Appeals agreed with the State and affirmed the defendant's conviction. The dissenting judge disagreed and would have granted the defendant a new trial based on the trial court's erroneous ruling regarding the questions the prosecution would be permitted to ask should the defendant choose to testify. We granted the defendant's application for permission to appeal.

## II. Analysis

In this Court, the defendant raises the same issues that he raised in the Court of Criminal Appeals. The State also takes the same positions that it took before the intermediate appellate court. With respect to the defendant's challenges to the sufficiency of the evidence and the adequacy of the State's election, we affirm without further discussion the analysis and decision of the Court of Criminal Appeals finding the evidence sufficient and the election adequate. Likewise, we accept the State's concession that the trial court erred in two respects.[10] Unlike the Court of Criminal Appeals, we conclude that the cumulative effect of these errors is prejudicial and entitles the defendant to a new trial. Because a new trial is required, we need not address the defendant's remaining two allegations of error.

### *A. Trial Court's Evidentiary Rulings*

### *1. Standard of Review*

We review a trial court's decision about the admissibility of evidence for an abuse of discretion. State v. Parker, 350 S.W.3d 883, 896-97 (Tenn. 2011). "'Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" Id. at 897 (quoting State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008)).

---

[10] We are not required to accept the State's concession but readily do so here. State v. Hester, 324 S.W.3d 1, 69 (Tenn. 2010).

## 2. Erroneous Admission of Recorded Forensic Interview

The defendant and the State are correct that the trial court abused its discretion by admitting MM's recorded forensic interview during her direct examination.[11] Although MM's recorded forensic interview was not as detailed as her trial testimony, it was generally consistent with her trial testimony. MM did not deny making any of the statements in her forensic interview and said her trial testimony was more detailed because she had remembered more details after the forensic interview.

The Tennessee Rules of Evidence do not specifically address the admissibility of prior consistent statements, but there is much Tennessee decisional law on the subject. Neil P. Cohen et al., Tennessee Law of Evidence § 8.05[5], at 8-50 n.170 (6th ed. 2011) [hereinafter Cohen].[12] Prior consistent statements are generally not admissible to bolster the testimony of a witness. Farmer v. State, 296 S.W.2d 879, 882 (Tenn. 1956); State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). Allowing such statements to be used to bolster a witness's testimony would pose a danger of "the jury being influenced to decide the case on the repetitive nature of or the contents of the out-of-court statements instead of on the in-court, under-oath testimony." State v. Tizard, 897 S.W.2d 732, 747 (Tenn. Crim. App. 1994).

One exception to this general rule permits the admission of prior consistent statements to rehabilitate a witness whose testimony is attacked on cross-examination as "recent fabrication" or "deliberate falsehood." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988); see also Farmer, 296 S.W.2d at 882. This exception permits the prior consistent statement to be used as a means of rebuffing such attacks and showing that the witness's trial testimony is consistent with statements made before any improper influence or motive to lie existed. Sutton v. State, 291 S.W. 1069, 1070 (Tenn. 1927). Thus, a prior consistent statement may be admitted pursuant to this exception only when the witness's testimony has "been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." Benton, 759 S.W.2d at 433-34; see also State v. Livingston, 907 S.W.2d 392,

---

[11] A statute authorizes the introduction of recorded forensic interviews in certain circumstances, but only if the child is under the age of thirteen when the statement is given. See Tenn. Code Ann. § 24-7-123(a) (Supp. 2014). MM was sixteen when the recorded forensic interview occurred, so the statute does not apply here.

[12] In this respect, the Tennessee Rules of Evidence differ from the Federal Rules of Evidence. See Fed. R. Evid. 801(d)(1)(B). Under the Federal Rules, a prior consistent statement is considered nonhearsay and is admissible as substantive evidence, so long as it was made before the charge of recent fabrication or improper influence or motive. Id.; see also Tome v. United States, 513 U.S. 150, 156-57 (1995).

398 (Tenn. 1995) (holding that a recorded prior consistent statement should not have been admitted because the ten-year-old child's credibility had not been sufficiently challenged on cross-examination to "permit the use of a twenty-minute audiotape detailing the abuse to rehabilitate the victim"); State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994) (recognizing that a prior consistent statement is only admissible as rehabilitative evidence after a witness's credibility has been attacked).

Prior consistent statements admitted pursuant to this exception are not to be used as substantive evidence of the truth of the matter asserted and are to be used only to rehabilitate the witness's credibility. Livingston, 907 S.W.2d at 398; Braggs, 604 S.W.2d at 885; Cohen § 8.05[5], at 8-49 to -50. Furthermore, upon request, a trial court should instruct the jury as to the limited purpose for which a prior consistent statement has been admitted. Tenn. R. Evid. 105; Livingston, 907 S.W.2d at 398; Braggs, 604 S.W.2d at 885.

MM's recorded forensic interview constitutes a prior consistent statement. As a result, the trial court here contravened the foregoing well-settled law by allowing for its admission during MM's direct examination, before defense counsel had cross-examined her or mounted any attack at all on her credibility.

*3. Erroneous Ruling Regarding Impeachment of the Defendant*

The trial court also abused its discretion by ruling that, if the defendant testified, the prosecution would be permitted to ask him generally if he had ever been previously arrested or convicted of a crime.[13]

Our analysis of this issue is governed by Tennessee Rule of Evidence 609, which authorizes the use of certain prior convictions for the purpose of attacking a witness's credibility. Tenn. R. Evid. 609(a). Rule 609 "is an exception to the general principle in [Tennessee] Rule [of Evidence] 404(a) that character evidence is inadmissible," and this exception "is based on the precept that it is appropriate for the trier of fact to look at a

_____

[13] We do not agree with the State's argument that the defendant failed to preserve his challenge to the trial court's ruling permitting questions about prior arrests. The trial court ruled that the State would be allowed to ask the defendant about prior arrests *while* ruling on the admissibility of the defendant's prior convictions. The State had not even requested permission to ask the defendant about prior arrests. Although the defendant did not use the words "prior arrests" in his motion for new trial, the defendant challenged the trial court's ruling on the admissibility of his prior convictions, which encompassed the sua sponte ruling about prior arrests. Additionally, on appeal, the defendant specifically challenged the trial court's ruling regarding questions about prior arrests, and the Court of Criminal Appeals addressed the merits of the issue, finding that the trial court erred, but concluding that the error was harmless. The record does not support the State's argument that the defendant waived this issue.

witness's character by considering some of the witness's criminal convictions" for the purpose of assessing the witness's credibility. Cohen § 6.09[2][a], at 6-91.

But Rule 609 does not permit the use of every prior conviction. Only prior convictions for felonies and crimes involving dishonesty or false statements may ever be used. Tenn. R. Evid. 609(a)(2). Moreover, before a qualifying prior conviction is used, certain procedures must be followed. Tenn. R. Evid. 609(a)(1), (3). Where, as here, the witness to be impeached is the defendant in a criminal case, the prosecution must give "reasonable written notice of the impeaching conviction" it intends to use before trial. Tenn. R. Evid. 609(a)(3). A prior conviction less than ten years old may not be used for impeachment unless the court first determines "that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). A prior conviction more than ten years old may *never* be admitted *unless* the trial court determines "in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect." Tenn. R. Evid. 609(b) (emphasis added). To apply either of these balancing tests properly, courts must focus particular attention on: (1) the relevance of the impeaching conviction to the issue of credibility; and (2) the similarity between the charged offense and the impeaching conviction. State v. Russell, 382 S.W.3d 312, 317 (Tenn. 2012); State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999); Cohen§ 6.09[10][c], at 6-104 to -105.

Here, the State gave the defendant pre-trial written notice of its intent to use his 1996 convictions of "indecent acts/liberties with a child under the age of 16" and "making a false statement under oath"[14] for impeachment purposes pursuant to Tennessee Rule of Evidence 609.[15] The State acknowledged that these convictions were more than ten years old, which

---

[14] The record shows that the defendant's convictions resulted from guilty pleas entered in a court-martial proceeding. Additionally, the offense to which the defendant actually pleaded guilty was making a false official statement to an agent of the Naval Criminal Investigative Service ("NCIS"), not making a false statement under oath. The defendant did not question whether his court-martial convictions may be used for impeachment under Tennessee Rule of Evidence 609; thus, we need not address that issue in this appeal. We note that, although this appears to be an issue of first impression in Tennessee, courts in other jurisdictions have addressed it. See generally 2 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 9:31, at 726-27 (15th ed. 1998) ("[C]ourt-martial proceedings generally can be used as impeachment, although some courts do not permit a court-martial conviction to be used for the purpose of impeachment." (footnote omitted)); R. Carol Terry, Annotation, Conviction by Court-Martial as Proper Subject of Cross-Examination for Impeachment Purposes, 7 A.L.R.4th 468 (1981) (collecting and analyzing cases that address the issue).

[15] The State alternatively sought to admit the conduct underlying the convictions pursuant to Tennessee Rule of Evidence 608, regardless of whether the defendant testified. The trial court denied this request.

meant the convictions were admissible for impeachment only if the trial court determined that their probative value substantially outweighed their prejudicial effect. Tenn. R. Evid. 609(b). The defendant opposed their admission.

The trial court conducted a jury-out hearing on the morning trial began and ruled that the State would not be allowed to question the defendant about his prior convictions, explaining that such questioning would be "highly prejudicial" because of the age of the prior convictions and their similarity to the charged offense in this case.[16]

Inexplicably, however, the trial court then ruled that, if the defendant testified, the State would be allowed to ask him if he had ever been arrested or convicted of a crime. If the defendant answered truthfully, the trial court explained, no further questioning would be permitted, but if he answered untruthfully, the State would be allowed to impeach him with evidence of the prior convictions. The trial court provided the following explanation for this ruling:

> If he [the defendant] opens the door, that's a different thing; because if you [the State] ask him—if he chooses to testify, okay—and you ask him, "Have you ever been arrested?—have you ever been involved in any other type of criminal proceeding?" at that point, he does open the door. But what I'm saying right now, in terms of you bringing this up and him not testifying, no, I'm not going to allow it in.
>
> . . . .
>
> It goes to honesty in terms if you ask him the question has he ever been—it does not go to the specifics. Okay. If he says, "Yes"—and I've already ruled that we're not going to discuss that, that's fine. But if you ask the question, and he clearly is not telling the truth on the stand, then I would allow you to impeach him.

---

[16] The trial court appears to have viewed the defendant's conviction of making a false official statement to an NCIS agent as similar to the charged offense of rape of a child because it arose from the investigation that resulted in the defendant's prior conviction for indecent acts/liberties with a child. This appeal does not present the issue of whether the trial court should have allowed the State to impeach the defendant with his prior conviction of making a false official statement to an NCIS agent. Should the State seek permission to use the defendant's prior convictions for impeachment purposes prior to his new trial, the trial court should evaluate each conviction separately when determining whether its probative value substantially outweighs its prejudicial effect, keeping in mind that convictions involving dishonesty are probative of truthfulness. Russell, 382 S.W.3d at 317.

Before the close of the defendant's proof, defense counsel asked the trial court to revisit its earlier ruling on the scope of cross-examination should the defendant choose to testify. The following discussion ensued:

THE COURT: You're opening the door; and if that's what you want to do, that's fine. I was trying to help you.

. . . .

I can't get any narrower than that because of the fact that the convictions—what saves you right now is the convictions are past ten years old. Okay. Also, I ruled already that they are highly prejudicial versus probative because of the fact that they basically are the same convictions that are being alleged at this time.

[Defense counsel]: Okay.

THE COURT: Now, you should have counseled your client about all of that—

[Defense counsel]: I did.

THE COURT:—about the fact that he's really getting—by law, he is not putting himself or placing himself in situations that the [S]tate can ask him about those specific crimes. But I don't think if you read that passage that you're referring to [in Tennessee Rule of Evidence 609] that it says that he cannot be asked about whether he's ever been convicted of a crime at all.

We readily accept the State's concession that the trial court's ruling regarding the permissible scope of cross-examination was erroneous. Thirteen years before the defendant's trial, this Court ruled that the prosecution may not impeach a defendant by asking whether he or she has been convicted of an "unnamed felony." State v. Galmore, 994 S.W.2d 120, 125 (Tenn. 1999). The same year, this Court held that the "offense must be identified to the finder of fact when a prior conviction is used for impeachment purposes pursuant to Rule 609(a)(3)." State v. Taylor, 993 S.W.2d 33, 35 (Tenn. 1999). Despite these longstanding decisions, the trial court's ruling here authorized the prosecution to ask the defendant, had he testified, whether he had ever been convicted of an unnamed crime. This ruling directly

contravened our decisions in Galmore and Taylor and constitutes an abuse of discretion.[17]

The defendant also challenges another portion of the trial court's ruling, which authorized the State to ask if he had ever been arrested. The State acknowledges that this portion of the trial court's ruling was "confusing." We agree.

A trial court must always strive to render clear rulings. Clarity is particularly important when a trial court's ruling pertains to the scope of impeachment that will be permitted should a defendant choose to testify. Clarity in such rulings enables lawyers to advise their clients fully and accurately about the benefits and drawbacks of testifying. Clarity allows a defendant to make an informed choice about testifying.

We agree with the State that the trial court "finally appeared to say that [the defendant] could be asked about arrests." Indeed, if the trial court intended to do something other than rule that the State would be allowed to ask the defendant about prior arrests should he testify, we cannot discern the trial court's other intent from the record on appeal. As the Court of Criminal Appeals concluded, the portion of the trial court's ruling allowing questions about prior arrests also is inconsistent with prior decisions of this Court and thus also constitutes an abuse of discretion. See, e.g., State v. Ivy, 188 S.W.3d 132, 154 (Tenn. 2006) ("[O]ur prior case law has long established that the prosecution may not rely on prior accusations, arrests, or indictments."); State v. Miller, 674 S.W.2d 279, 284 (Tenn. 1984) (discussing the general rule that arrests and indictments are generally inadmissible and reversing a death sentence because the prosecution had introduced evidence to show that the defendant had previously been arrested on charges of rape); State v. Teague, 645 S.W.2d 392, 399 (Tenn. 1983) (reversing a death sentence because the trial court allowed evidence of a prior arrest that was irrelevant, especially since the resulting charge was dismissed); Montesi v. State, 417 S.W.2d 554, 560 (Tenn. 1967) ("It is well settled in this State that an accused himself on trial may not be asked about pending indictments against him on cross-examination.").

---

[17] The trial court's comment that the defendant would have been "opening the door" to such impeachment by answering the impermissible question untruthfully deserves comment. "'[O]pening the door' is an equitable principle that permits a party to *respond to an act of another party by introducing otherwise inadmissible evidence.*" State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012) (emphasis added). Responding to a cross-examination question that the trial court erroneously allowed the prosecution to ask is not an example of opening the door.

### B. Cumulative Error Doctrine

"[T]his Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Automatic reversal is a remedy reserved for structural constitutional errors, such as "the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury." Id. (citing Momon v. State, 18 S.W.3d 152, 165-66 (Tenn. 1999)). Non-structural constitutional errors are subject to harmless error analysis and require reversal unless the State demonstrates beyond a reasonable doubt that the error did not contribute to the verdict obtained. Id. The third category of error is non-constitutional errors. Id. at 371-72. For such non-constitutional errors "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. at 372 (quoting Tenn. R. App. P. 36(b)).

The errors in this case fall into the third category of non-constitutional error. See Galmore, 994 S.W.2d at 125 & n.3 (applying the non-constitutional error standard to evaluate the trial court's erroneous ruling regarding the scope of cross-examination, "[b]ecause the defendant was free to testify despite the trial court's ruling" and was not thereby deprived "of a fundamental constitutional right"); Benton, 759 S.W.2d at 434 (applying the non-constitutional error standard to evaluate the erroneous admission of a prior consistent statement); accord State v. Waller, 118 S.W.3d 368, 374 (Tenn. 2008) (applying the non-constitutional harmless error standard to evaluate the trial court's error in allowing the State to impeach the defendant with prior felony drug convictions). Ordinarily, we would consider each error separately to determine whether the defendant has demonstrated that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We need not conduct such separate analyses here, however, because the cumulative prejudicial effect of these non-constitutional errors entitles the defendant to a new trial. See, e.g., State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (declining to apply an individual harmless error analysis to the erroneous admission of evidence when the defendant was entitled to a new trial on other grounds).

The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial. Hester, 324 S.W.3d at 76; see also State v. Clark, No. M2010-00570-SC-R11-CD, 2014 WL 5801658, at *26 (Tenn. Nov. 10, 2014) ("The cumulative error doctrine embodies the idea that a multiplicity of errors—though individually harmless—may in the aggregate violate a defendant's due process right to a fair trial."). "To warrant assessment under the cumulative error doctrine, there must have been more than one

actual error committed in the trial proceedings." Hester, 324 S.W.3d at 77. As we recognized in Hester,

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

Hester, 324 S.W.3d at 76-77. As we explained in Hester,

> claims under the cumulative error doctrine are *sui generis*. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Id. (alterations in original) (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)).

Reversals for cumulative error are rare. Hester, 324 S.W.3d at 76. A prior decision of this Court exemplifies the circumstances in which reversal for cumulative error is appropriate. State v. Bigbee, 885 S.W.2d 797, 800 (Tenn. 1994), superseded by statute on other grounds, Act of Apr. 23, 1998, ch. 915, 1998 Tenn. Pub. Acts 646, 646, as recognized in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). In Bigbee, the trial court erroneously permitted the State to introduce evidence that later provided the factual basis for highly provocative improper arguments during the State's closing argument. Bigbee, 885 S.W.2d at 809-12. This Court held that although "each of the errors . . . might have been harmless standing alone," when "considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affected the jury's sentencing determination to the defendant's prejudice." Id. at 812. Here, as in Bigbee, we are convinced that when considered cumulatively the non-constitutional errors more probably than not affected the verdict.

The two errors in this case functioned to bolster MM's credibility and to silence the defendant. The proof of guilt in this case, while sufficient to support the conviction, was not

-24-

overwhelming. The abuse was not reported until 2010, four years after MM testified that it had ended. According to Ms. Shields, MM denied the abuse when questioned about it in 2009. MM's testimony about how, where, and when the abuse occurred was general and vague, and no physical evidence of the abuse was presented. MM's testimony about the date she confronted the defendant—July 4, 2006—was inconsistent with other proof in the record, which demonstrated that Ms. Shields and MM were no longer living with or having contact with the defendant on that date. Although Ms. Walker testified that she saw the defendant enter MM's bedroom when they were children, neither she nor MM reported this incident on the night it occurred, even though Ms. Walker was thirteen years old at the time. No other family member witnessed the abuse or observed the defendant walking through the residence nude or emerging from MM's room. MM's childhood diary, which the defense received on the morning of trial, referenced the abuse only once in an entry written on October 4, 2006, three months after MM testified that the abuse had ended. Moreover, the single reference appeared in the middle of a lengthy entry in which MM expressed intense anger toward and dislike of Ms. Shields, and a desire to kill her. MM also continued to have contact with and depend on the defendant for emotional and financial support long after the defendant and Ms. Shields divorced, which the defense attempted to characterize as inconsistent with the abuse.

Simply put, MM's credibility was the linchpin on which the prosecution's case rested. The trial court erroneously permitted the prosecution to bolster her credibility by playing the entire recorded forensic interview during its case-in-chief and again during jury deliberations. The trial court did not provide an instruction limiting the jury's consideration of the prior consistent statement. As a result, when considered with MM's trial testimony, the jury heard MM say that the defendant sexually abused her not once, not twice, but *three* times.

On the other hand, the defendant decided not to testify only after the trial court twice erroneously ruled that, if he did so, the State would be permitted to question him about prior arrests and convictions. That the trial court's erroneous ruling more likely than not influenced the defendant's decision is reflected in the record on appeal. Defense counsel raised the issue on the morning of trial and before the close of the defendant's proof. A defendant is not required to establish that he would have testified but for a trial court's adverse ruling in order to preserve the issue for review. Galmore, 994 S.W.2d at 123. Furthermore, "[i]f the [trial] court makes a final determination that [certain] proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination." Tenn. R. Evid. 609(a)(3). Although we have acknowledged that, in some cases, "an offer of proof "may be the only way to demonstrate prejudice," Galmore, 994 S.W.2d at 125, this is not such a case.

"'An offer of proof serves two primary purposes: (1) informing the trial court about the proof the party is seeking to offer; and (2) creating a record so that an appellate court can

review the trial court's decision.'" Taylor v. State, 443 S.W.3d 80, 84 (Tenn. 2014) (quoting State v. Torres, 82 S.W.3d 236, 251 (Tenn. 2002)). The written pre-trial notice informed the trial court and this Court of the prior convictions the State wished to use for impeachment purposes. The record on appeal is otherwise sufficiently developed to allow for meaningful appellate review. Here, the defendant pleaded not guilty to the charge. Defense cross-examination at trial focused on raising doubts about the accuracy of the testimony of prosecution witnesses. And Ms. Shields, the only witness to testify for the defendant and the only other person who lived in the home with MM and the defendant, denied that the abuse ever occurred and stated that the defendant had been a father figure to MM. The defense theory of innocence is clearly reflected in the record, despite the lack of an offer of proof.[18]

Although it is true, as the Court of Criminal Appeals noted, that defense counsel effectively pointed out the weaknesses in the State's proof, counsel's effective representation was not sufficient to remedy the cumulative effect of the two errors by in this case. A defendant's right to make an informed, free, and unfettered decision about testifying in his own behalf is of fundamental importance. Momon, 18 S.W.3d at 161-62; see also State v. Rimmer, 250 S.W.3d 12, 27-28 (Tenn. 2008).[19] Additionally, as we have previously recognized, a defendant's "own confession is probably the most probative and damaging evidence that can be admitted against him" because a defendant's admissions "come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." State v. Climer, 400 S.W.3d 537, 570-71 (Tenn. 2013) (quoting Arizona v. Fulminante, 499 U.S. 279, 296 (1991)) (internal quotation marks omitted). These observations apply with equal force to a defendant's testimony in his own behalf. Defense counsel's able representation, while commendable, cannot be viewed as a sufficient remedy for the prejudicial cumulative effect of the errors in this case.

Moreover, the trial court took no curative measure, such as limiting instructions concerning the use of MM's prior consistent statement, to ameliorate the effect of these dual errors. Having evaluated the considerations Hester identified as relevant, we conclude that the cumulative effect of the two conceded trial errors was prejudicial and entitles the defendant to a new trial.

---

[18] The circumstances of this case differ from post-conviction proceedings, in which an offer of proof generally is necessary for a petitioner to prevail on an assertion that trial counsel's failure to interview a particular person before trial or to call a particular witness at trial constituted deficient performance and resulted in prejudice. See, e.g., Taylor, 443 S.W.3d at 85 (discussing the necessity of an offer of proof in such circumstances).

[19] The defendant has not argued that he was deprived of his constitutional right to testify.

### C. Other Issues

Because we are remanding for a new trial, we need not address the defendant's assertions that the trial court erred by refusing to admit into evidence a letter MM had written to Ms. Shields in 2009, in which MM described herself as a virgin, and by failing to take corrective action when Ms. McCrary testified about driving the defendant to DUI classes. We caution that, at the new trial, the standards provided in the Tennessee Rules of Evidence and other relevant Tennessee law must be carefully applied when determining the admissibility of evidence and the use of the defendant's prior convictions for impeachment purposes.

## III.  Conclusion

The judgment of the Court of Criminal Appeals is reversed in part and affirmed in part.  The defendant's conviction is vacated, and this case is remanded for a new trial, consistent with this decision.  Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE