# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 19, 2016 Session

## STATE OF TENNESSEE v. JENNIFER MURRAY JEWELL

### Appeal from the Circuit Court for Williamson County
### No. I-CR116885    Joseph Woodruff, Judge
_____

### No. M2015-02141-CCA-R3-CD – Filed January 6, 2017
_____

The Defendant, Jennifer Murray Jewell, entered a "best interest" guilty plea to one count of theft of property valued at over $60,000 in violation of Tennessee Code Annotated section 39-14-103, a Class B felony.  Pursuant to the plea agreement, the Defendant was sentenced to ten years of supervised probation, and the parties agreed that restitution would be set by the trial court at a subsequent hearing.  After considering the proof presented at the hearing, the trial court ordered the Defendant to pay more than $800 per month as restitution.  On appeal, the Defendant argues that the trial court failed to follow correct procedure or consider her ability to pay in calculating the amount of monthly restitution she would owe.  She also argues that the restitution award should be overturned because the State failed to prove the amount of the loss.  Because we conclude that the State introduced inadequate proof regarding the valuation of the loss, we reverse and remand for a new hearing on the issue of restitution.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

M. Matthew Milligan, Franklin, Tennessee, for the appellant, Jennifer Murray Jewell.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Tammy Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant's conviction was based on a series of thefts, allegedly amounting to over $372,000, committed between 2004 and 2009[1] against her employer. Between 2001 and 2009, the Defendant served as the office manager of Wilson and Associates Engineering and Surveying, P.C. ("Wilson and Associates"), a family-run company engaged primarily in highway construction and surveying in a multi-state area. The company had approximately thirty employees, and many employees had company credit cards used to make purchases for the company.

When the Defendant left in 2009, Wilson and Associates asked a former employee, Janet Taylor, to train the new office manager. Ms. Taylor began her employment with the company in 1998, and she retired in 2005 but maintained a relationship with the company's owners. After the Defendant's departure, there was some "turmoil," and Ms. Taylor began to train Jennifer Russell, the Defendant's replacement. Ms. Taylor testified that she and Ms. Russell were "not hunting for things" but "[t]hey just started popping up."

Ms. Russell testified that when she and Ms. Taylor looked through the accounts, they noticed that the accounts had not been reconciled in some months. They also noticed that the credit card accounts had some allocations in suspiciously round numbers, for instance $5,000 for office expenses. She and Ms. Taylor then noticed numerous charges to the Defendant's company credit card for expenses that did not seem business-related. The Defendant had made purchases at Neiman Marcus, Best Buy, Kay Jewelers, and various home improvement stores. Ms. Russell testified that the company's credit card statements were only available back to 2004. After looking through all the statements, Ms. Russell and Ms. Taylor concluded there were $330,000 in fraudulent charges, $25,000 of which was forgiven by the credit card company.

Ms. Russell testified that she and Ms. Taylor also found that the Defendant was stealing money through payroll. Ms. Russell stated that the payroll was done by the Defendant and that the Defendant increased her gross pay significantly but hid it by having the unearned money taken out as federal withholding, which she would eventually obtain as a large income tax refund. Ms. Russell stated that the Defendant was overpaid,

---

[1] As the State observes, the theft statute has since been amended to make the theft of over $250,000 a Class A felony. *See* 2012 Tenn. Pub. Acts, ch. 1080.

receiving approximately $90,000 in salary in 2008, when her salary should have been $59,000.

Another avenue of loss was through the company's checking accounts. Ms. Russell testified that she and Ms. Taylor discovered that while the company's records showed checks written for apparently legitimate business expenses, such as auto repairs, those checks were actually written to a home repair company near the Defendant's residence and that the company would not provide any receipts when Wilson and Associates attempted to track the expenses. Approximately $20,000 was stolen in this way.

Ms. Russell testified that the company spent approximately $50,000 investigating the fraud, including expenses for accountants and attorneys. She estimated that the total loss to the company was $372,000. Ms. Taylor confirmed that this was the total value of the loss. According to Ms. Russell, LeRoy Wolfe, a firm of forensic accountants, verified the calculations Ms. Russell and Ms. Taylor had made regarding the theft, and the accountants made no changes to Ms. Russell and Ms. Taylor's conclusions regarding the amount of the loss.

When Ms. Russell first began to estimate the company's losses, the Defendant objected based on the lack of written records introduced into evidence. The State responded that it had "the records to back it up," and the prosecutor stated, "I can enter them as an exhibit." The State also noted that the facts of the offense were recited at the plea hearing. Ms. Russell testified that she and Ms. Taylor had created a binder of documentation which was given to the State. Ms. Taylor also testified that they had compiled the evidence of the theft in binders, and she stated that all of the losses were documented in the binders. Defense counsel acknowledged, "We've seen [the] binders." However, no binders or other exhibits documenting the losses were introduced into evidence.

Ms. Russell acknowledged that she knew the Defendant planned to file a worker's compensation claim against the company after her termination and that she heard of a lawsuit "with some sexual nature." She acknowledged that some employees might be more "favored" in a small company.

Tyree Harris IV served as the attorney for Wilson and Associates, and he testified that he was first contacted about the Defendant when he was made aware that she intended to file a worker's compensation claim for emotional distress. This claim was withdrawn, but Mr. Harris then received a letter informing him that the Defendant intended to file a claim for harassment. Mr. Harris told the attorneys representing the

Defendant that the company was in the midst of investigating her for large-scale theft, and no litigation was ultimately filed.

During the cross-examination of Ms. Taylor and Ms. Russell, the defense implied that some of the losses were not thefts but gifts given to the Defendant by the owners. Ms. Russell acknowledged that the owners of the company gave gifts to the employees. She testified that they had given $500 to a dog rescue foundation in honor of her and that she had received some fish to fry. She also received approximately $12,000 in bonuses over the course of six years.

Ms. Taylor also testified that the owners of Wilson and Associates gave the employees gifts. She testified that the Wilsons had paid for a family vacation for herself and her husband shortly before 2005, which she estimated was a $1,200 value. The owners also paid for most of the employees to take a trip to San Francisco around the time of a business convention there. The Defendant did not go on this trip because she was needed in the office, and the owners paid for the Defendant to take a trip to Philadelphia with her daughter at a later point because she had not been able to go to San Francisco. Around 2002, the owners also paid for Ms. Taylor and the Defendant to go on a trip to St. Martin because the owners had a prepaid vacation stay that they decided not to use.

Ms. Russell stated that legitimate per diems and bonuses were not calculated into the total loss. Ms. Taylor also testified that the loss total did not include anything that was "questionable," and that if they were not sure of the legitimacy, the expense was not included in the amount of the loss. Ms. Taylor stated that they asked each member of the family regarding the expenses and that some were not included because they were determined to be gifts. Ms. Taylor affirmed, "everything that we put in there we thought was fraud, that's all." She stated that the owners did not give gifts by increasing an employee's tax withholding and that they did not give gifts by writing checks to one entity and putting the name of another entity into the company records. The owners sometimes left signed blank checks in the office.

Ms. Russell testified that the owners were "very trusting people" from whom she had seen "nothing but kindness and love" and that the company is "not only family owned, it is a family." Ms. Taylor also testified that "there had been a lot of trust" and that it was difficult to accept the trust had been misplaced. She stated that one of the owners of the company chose not to run for re-election as commissioner due to the theft.

The Defendant was terminated from her position in 2009. Her testimony at the sentencing hearing centered in a large part around her current financial means. The Defendant testified that she worked forty to fifty hours per week, split between two jobs.

In one job, she was an administrative assistant for a builder, working three twelve-hour shifts per week and earning approximately $1005 every two weeks on a salaried basis. In another job, she worked ten to thirteen hours per week making fifteen dollars per hour. She stated that her salaried position was somewhat precarious because it was with a company that was in the process of dissolving and that her employer had recently had to borrow money to pay her. The Defendant testified, however, that her employer planned to open a new company and planned to employ her with his new company.

The Defendant's main expenses were $150 weekly for rent, $145 monthly for telephone and internet, which she stated was needed for her work, and a monthly car payment of $569. The Defendant's outstanding debt was approximately $1,500 owed on credit cards, approximately $2,000 owed to the IRS, and approximately $18,000 to $19,000 owed for medical care. She testified she also made monthly payments on her bond.

The Defendant testified that she lived a modest lifestyle. She stated that she did not eat out except for an occasional meal at McDonald's for $3.80. Her apartment was approximately three hundred square feet. She testified that she currently had $3.00 in two bank accounts. She drove a 2012 Ford Focus, which was worth $8,000 to $9,000, but her outstanding debt on the car was $10,000, and she did not have the cash to make up the difference to sell the vehicle. The Defendant was fifty-three years old at the time of the hearing, and she testified that she had sought other employment but that her felony conviction prevented her from finding the type of work she had performed for the victims.

The Defendant introduced a budget which she had herself prepared, and she introduced check stubs from her two jobs showing her earnings for a period of weeks. Her budget shows that, after her expenses, she had approximately $62.27 left in her account in June, approximately $37.27 in July, and approximately $3.16 in August. The Defendant testified that the budget contained estimates from September through the remainder of the year but that she used her "actual expenses" to arrive at the numbers in the budget spreadsheet prior to that month. The Defendant testified that her employer had previously given her $450 per month for health insurance and telephone bills, but that her employer stopped doing so, and the spreadsheet reflected the change in August. She estimated that her income would be approximately $2,260.61 per month, that her telephone and rent fluctuated between $720 and $870 per month, and that her transportation expenses, including her car payment, gas and insurance, was approximately $900 per month. She spent $80 per month on coin laundry, $81.30 on car insurance, and approximately $250 on gas. She no longer carried medical insurance but planned to spend approximately $113 per month on medication and the cost of seeing a

psychiatrist. She budgeted approximately $285 per month for the payment of court costs, credit cards, and the IRS.

We note some discrepancies between the Defendant's budget, which she testified reflected actual amounts through August and estimates for the rest of the year, and her pay stubs. For instance, the Defendant estimated she earned $250 at her second job in August, but her check stubs reflect that she was paid $443.29 at this job between August 11 and August 20, 2015. Likewise, the Defendant entered three check stubs from her salaried job. These check stubs show both the Defendant's "Current" and "YTD" earnings. According to the stubs, the Defendant was paid $1005.61 after taxes on July 31, on August 14, and on September 9. The "YTD" amounts reflect that these were the only payments she had received from the company, although the Defendant's budget and testimony reflected that she had worked for the company for months and had recently taken a pay cut in which she lost income allocated to medical insurance and a telephone allowance.

The Defendant acknowledged that she had made almost $100,000 one year by doing work both for Wilson and Associates and for various members of the owner's family in personal matters. She testified that when she was terminated, she was given $10,000, a new Mazda Miata, and health insurance as severance. She stated she was terminated because the owner's son, who was also employed at Wilson and Associates, wanted her to give him information that the owner did not want him to have. She acknowledged that she had five prior convictions for theft from around 1990 for stealing from another employer, and four of these were felonies. She testified that she sold all of her possessions around 2009 or 2010, including her jewelry, and that she did not have any valuable personal property or retirement savings. She testified that she also sold the car she was given as severance.

The trial court found that the victim's total loss was $372,000. The court noted that it must consider the Defendant's ability to pay and determine a payment schedule consistent with that ability to pay. The court found that the fifty-three-year-old Defendant had obtained a GED and that the court was "favorably impressed with her diligence and work ethic," finding that her description of her salaried job contained "a degree of complexity that reflects favorably upon her in terms of her value as an employee." The court noted that her employer's willingness to employ her at his new company also reflected favorably on her.

The trial court stated that the Defendant would have ten years to "pay restitution that is commensurate with her ability and future ability to make restitution" and that the payment would "take[] into account the magnitude of the loss to the company." The court determined that the total restitution should be $100,000, and that it could be paid in

monthly installments of $833.33 per month. The court stated that "the savings that she is forecast to realize after the vehicle expense goes away, plus savings I think she could realize by getting some cheaper liability insurance is sufficient to address that." The court acknowledged that the Defendant's "present earnings are providing her with a almost hand to mouth sort of existence" but stated that it was "favorably impressed with the defendant's diligence and work ethic and I believe that she has the ability to pay restitution in that amount."

After some discussion among the parties regarding the fact that the judgment of conviction was actually entered four months prior to the restitution hearing[2] and that the Defendant's probation would expire ten years from the entry of judgment, the trial court stated that the payments for the lapsed period should be spread over the length of the probation, increasing each payment by approximately $28.47, which the trial court found not to be a "material variance." The Defendant was ordered to pay $861.80 per month.[3] She appeals the trial court's restitution order.

## ANALYSIS

The Defendant on appeal argues that the trial court failed to follow a mandatory procedure when it first decided the total amount of restitution and then calculated the monthly payments from that total amount. The Defendant also asserts that the trial court erred in not considering her financial resources or future ability to pay when it set restitution. Finally, the Defendant challenges the adequacy of the proof establishing the victim's losses.

Sentencing decisions are reviewed for abuse of discretion, granting a presumption of reasonableness to within-range sentences reflecting a proper application of the purposes and principles of the Sentencing Act. *State v. Bise,* 380 S.W.3d 682, 707 (Tenn.

---

[2] As the State correctly notes, the order of restitution and the judgment of conviction together constitute a final judgment from which the Defendant may appeal, and her appeal is thus timely. *See State v. David Allan Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *4 (Tenn. Crim. App. Oct. 25, 2013).

[3] After filing the notice of appeal, the Defendant filed a motion for stay of restitution, alleging that she had been terminated, was receiving electroshock therapy, and was unable to procure further employment. The prosecution argued that the trial court had lost jurisdiction, that the appropriate method to address the Defendant's concerns was to seek a change to probation conditions under Tennessee Code Annotated 40-35-308, and that the trial court was without jurisdiction to modify the probation until the completion of the appeal. *See* T.C.A. § 40-35-304(f) (providing that the State, victim, or defendant may "at any time" petition for an adjustment of the restitution). Because the record does not reflect the outcome of these proceedings, we do not address them as part of this appeal.

-7-

2012).   This standard of review applies likewise to questions related to alternative sentences.  *State v. Caudle,* 388 S.W.3d 273, 278-79 (Tenn. 2012).   Restitution is authorized by the statute governing alternative sentences.   T.C.A. § 40-35-104(c)(2). This court has previously determined that the abuse of discretion standard of review applies to decisions regarding restitution.  *State v. David Allan Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. Oct. 25, 2013).   A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining.  *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).   The burden of demonstrating a sentence's impropriety falls on the defendant.  T.C.A. § 40-35-401, Sentencing Comm'n Cmt.

An alternative sentence may include the payment of restitution.  T.C.A. § 40-35-104(c)(2).   Restitution itself is mandatory in theft convictions.  T.C.A. § 40-20-116(a); *State v. Gary Sulo Alto*, No. M2014-01159-CCA-R3-CD, 2015 WL 1881098, at *8-9 (Tenn. Crim. App. Apr. 24, 2015) *no perm. app. filed*.   Restitution is meant to compensate victims as well as punish and rehabilitate offenders.  *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997).   Tennessee Code Annotated section 40-35-304 governs the procedure for imposing restitution.  Under the statute:

(a) A sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation.

(b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

(c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments. The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

(d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

T.C.A. § 40-35-304.

The amount of restitution is limited to the victim's pecuniary loss, but it "'does not have to equal or mirror the victim's precise pecuniary loss.'" *State v. Bottoms*, 87 S.W.3d 95, 106 (Tenn. Crim. App. 2001) (quoting *State v. Smith,* 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994)). "An order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." *Johnson*, 968 S.W.2d at 886. Moreover, the amount of restitution need not be determined "'in accordance with the strict rules of damages applicable to a civil case.'" *Id.* at 887 (quoting *People v. Johnson,* 780 P.2d 504, 507 (Colo.1989)). In fact, "[t]here is no designated formula or method for the computation of restitution." *Smith*, 898 S.W.2d at 747. The amount must, however, be based on the victim's pecuniary loss and the defendant's ability to pay. *Id.* Pecuniary loss includes special damages and reasonable expenses incurred in filing charges or cooperating with investigation and prosecution, but not general damages. T.C.A. § 40-35-304(e). Special damages are the actual, but not necessary result of the injury when they are the natural and proximate consequence of the injury. *David Allan Bohanon*, 2013 WL 5777254, at *6. Restitution may not extend beyond the expiration of the sentence, but any unpaid amount remaining may be converted into a civil judgment. T.C.A. § 40-35-304(g)(2), (h)(1). The sum ordered to be paid as restitution must be reasonable. *Bottoms*, 87 S.W.3d at 106; *Smith*, 898 S.W.2d at 747.

## A. Procedure for Imposing Restitution

The Defendant challenges the trial court's alleged failure to follow the proper procedure in setting restitution. She argues that, according to "Tennessee case law," the amount of restitution should be set at the amount the Defendant can afford to pay per month multiplied by the length of the probation. However, the Defendant cites no case law for this proposition, and we likewise cannot locate any. While the Defendant asserts that the trial court erred because it first set the restitution amount at the round dollar value of $100,000 and then divided this value by the length of probation to find the monthly amount owed, we find no support for the proposition that the trial court was required to set the monthly amount first and then multiply by the number of months of probation. Instead, the statute the Defendant cites merely requires the court to "consider the financial resources and future ability of the defendant to pay." T.C.A. § 40-35-304(d). Furthermore, "[t]here is no designated formula or method for the computation of restitution." *Smith*, 898 S.W.2d at 747. The Defendant acknowledges that this argument would be "moot" if the monthly restitution payment were within the Defendant's means. We conclude that there was no violation of procedure in setting the amount of restitution, and we proceed to consider the claim that the trial court failed to properly consider the Defendant's financial resources in setting the payment amount.

## B. Ability to Pay

The Defendant argues that the evidence established that she cannot afford the payments imposed by the trial court, and that the restitution was accordingly set without consideration of her financial resources and future ability to pay. In setting restitution, the trial court "must ascertain both the amount of the victim's loss and the amount which the defendant can reasonably be expected to pay." *Bottoms*, 87 S.W.3d at 108. Considering the defendant's resources and ability to pay in setting restitution "'is a judicial duty that the trial judge cannot delegate to another.'" *State v. Darren Eugene Fleshman*, No. E2013-00557-CCA-R3-CD, 2014 WL 2804183, at *9 (Tenn. Crim. App. June 18, 2014), *perm. app. denied* (Tenn. Nov. 21, 2014) (quoting *State v. Donna Harvey,* No. E2009-01945-CCA-R3-CD, 2010 WL 4527013, at *5 (Tenn. Crim. App. Nov. 9, 2010)).

In *State v. David Allan Bohanon*, the trial court acknowledged the defendant was indigent but speculated that his financial circumstances might change and ordered him to pay $200 per month in restitution. *David Allan Bohanon*, 2013 WL 5777254, at *3. This court reversed and remanded for a new hearing, concluding that the amount was not reasonable considering the defendant's ability to pay. *Id.* at *8. In *State v. Bottoms*, we likewise concluded that ordering restitution of $10,000 for a defendant who would be imprisoned for much of the sentence and who had limited resources was not reasonable. *Bottoms*, 87 S.W.3d at 108-09.

In *State v. Johnson*, this court, conducting a de novo review, also concluded that the trial court failed to consider the defendant's resources when it ordered the defendant to pay $2,000 per month above the agreed-upon restitution amount, even though the defendant was unemployed and had extensive debts in addition to living expenses. *Johnson*, 968 S.W.2d at 886. This court in *State v. Smith* concluded that the restitution amount of $92,111 over six years was unrealistic based on the defendant's expenses and weekly pay of $245. *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994); *compare State v. Emily Brittany Davis*, No. M2015-00262-CCA-R3-CD, 2015 WL 5564204, at *3 (Tenn. Crim. App. Sept. 22, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016) (defendant's failure to introduce proof regarding resources would have rendered a decision that she was unable to pay "mere speculation").

In *State v. Darren Eugene Fleshman*, the trial court erred in setting the restitution at an amount that it was "not likely that [the defendant] reasonably could be expected to pay" in full. *Darren Eugene Fleshman*, 2014 WL 2804183, at *10. This court noted that the defendant in that case introduced evidence of a meager monthly income and that the trial court did not consider the defendant's resources or ability to pay. *Id.* The error was compounded by the trial court setting minimum monthly payments at an amount far

below that necessary to reach the amount of restitution prior to the expiration of the sentence, making it possible for the defendant to simultaneously fulfill the conditions of the monthly payments and violate the order by not paying the total restitution. *Id.*; *see also State v. Mario Norfleet and Terence Mitchell*, No. W2014-00780-CCA-R3-CD, 2015 WL 7566745, at *21-22 (Tenn. Crim. App. Nov. 23, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016) (the trial court erred when it set a restitution amount of $166,857, to be paid in $250 installments over a period of ten years, because the defendant would not be able to comply with the order regarding the total restitution by paying the minimum monthly amount).

Even a high restitution payment may be upheld, however, where the trial court has considered the defendant's ability to pay. In *State v. Sanders*, the defendant had agreed to a restitution amount between $60,000 and $250,000, and the trial court ultimately ordered $250,000 in restitution, after finding that the defendant had $47,000 in assets and no significant debts. *State v. Jay Herman Sanders*, No. M2014-00346-CCA-R3-CD, 2015 WL 526818, at *10-11 (Tenn. Crim. App. Feb. 9, 2015) *no perm. app. filed*. While the trial judge commented, "I don't know if you'll ever be able to pay that back," this court on appeal concluded that the trial court had determined that the payments would be challenging but did not determine that the defendant would not be able to pay, and affirmed the restitution amount. *Id.* at *11.

Likewise, in *State v. Jerry Lee Truette*, the defendant, who made $250 per week, was ordered to pay restitution in monthly installments of $500. *State v. Jerry Lee Truette*, No. M2005-00927-CCA-R3-CD, 2006 WL 2000540, at *2 (Tenn. Crim. App. July 19, 2006). This court upheld the amount, noting that there was nothing to contradict the trial court's finding that the defendant could obtain additional employment "delivering pizza at night" in order to afford the restitution payments. *Id.* at *2, 4.

Here, the Defendant introduced evidence regarding her limited circumstances, which tended to show that she used all of her income on debts and living expenses. The Defendant testified she worked forty to fifty hours per week. The trial court acknowledged that the Defendant lived "almost hand to mouth," but the trial judge stated that he believed that the Defendant would be able to pay. The trial judge noted that he was "favorably impressed with the defendant's diligence and work ethic and I believe that she has the ability to pay restitution in that amount," and the court also cited to the projected savings she would realize after her $569 monthly vehicle payment expired and "by getting some cheaper liability insurance."

We conclude that the trial court considered the Defendant's financial resources and ability to pay as required by statute. While we acknowledge that the monthly restitution amount is, particularly prior to the expiration of the Defendant's car payment,

much higher than the Defendant's current surplus income, we take the trial court's allusion to the Defendant's work ethic and her ability to complete complex tasks as a determination that she was perhaps deliberately under-employed or hiding resources in order to avoid the prospect of restitution. The irregularities we noted with the Defendant's pay stubs support this conclusion. We note that the Defendant has the ability to petition for adjustment of the restitution, as does the State. T.C.A. § 40-35-304(f). "If the monthly payment amount appears to be excessive based upon the anticipated income of the defendant, the trial court is in a better position to determine whether relief is warranted at some future date." *State v. Jerry Lee Truette*, 2006 WL 2000540, at *4. The trial court explicitly considered the Defendant's ability to pay when it set the restitution amount and again when it recalculated the monthly payments based on the lapse of some months of the Defendant's probation. We conclude the trial court did not abuse its discretion by failing to consider the Defendant's ability to pay. We note that in the further proceedings required by this opinion, the trial court will in any event be required to reconsider the amount of monthly restitution based on proof of actual loss.

### C. Proof of Loss

The Defendant next argues that the State presented insufficient evidence regarding the extent of the victim's loss. The State responds that the testimony of the employees was by itself sufficient to establish the loss.

Insofar as the Defendant objects to the lack of documentation in the presentence report, we conclude that any error was harmless. Under statute, the trial court is required to "order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss." T.C.A. § 40-35-304(b). However, any error in technical noncompliance is harmless when the defendant has the opportunity to respond to and contest any documentation and when the defendant is given "full consideration under the law regarding restitution." *State v. Moore*, 814 S.W.2d 381, 384 (Tenn. Crim. App. 1991). In *Moore*, the presentence report did not distinguish which part of the victim's loss was attributable to the defendant, but the court concluded that a subsequent hearing which included such documentation cured the error. *Moore*, 814 S.W.2d at 384. In *State v. Johnson*, however, the presentence report, which contained nothing regarding the victim's losses, deprived the defendant of the opportunity to challenge the victim's evidence regarding lost wages at the sentencing hearing, entitling him to a new hearing. *Johnson*, 968 S.W.2d at 885. Unlike the defendant in *Johnson*, the Defendant here acknowledged she was provided with the binders which detailed the loss prior to the hearing, and accordingly she was able to prepare and to contest any proof of the victim's loss which the State might offer at the subsequent hearing. The fact that the documentation was not included in the presentence report does not entitle her to relief.

Pecuniary loss must be substantiated by the evidence in the record or agreed to by the defendant. T.C.A. § 40-35-304(e)(1); *David Allan Bohanon*, 2013 WL 5777254, at *6. Because an order of restitution may be converted to a civil judgment, T.C.A. § 40-35-304(h)(1), the burden of proof may not fall far below that required in a civil suit in order to prevent criminal courts from becoming "'a haven for "victims" who think their losses might not meet the level of proof necessary to recover in a civil case.'" *Bottoms*, 87 S.W.3d at 108 (quoting *State v. Larry Lee McKinney,* No. 03C01-9309-CR-00307, 1994 WL 592042, at *4 (Tenn. Crim. App. Oct. 26, 1994)). The victim must present sufficient evidence to allow the trial court to make a reasonable determination of loss. *Bottoms*, 87 S.W.3d at 108. "While a victim's testimony alone may be sufficient to establish special damages for purposes of restitution, general statements regarding the amount of loss without explanation as to how the value was determined are insufficient." *David Allan Bohanon*, 2013 WL 5777254, at *7; *see Jerry Lee Truette*, 2006 WL 2000540, at *3 (quoting *State v. Charles R. Turner,* No. M2003-02064-CCA-R3-CD, 2004 WL 2775485 (Tenn. Crim. App. Dec. 1, 2004) for the proposition that "[g]eneral statements by a victim regarding the amount of his or her loss containing no explanation as to how the victim arrived at the amount are insufficient"). Documentation supporting testimony regarding loss is "helpful." *State v. Tarojee M. Reid*, No. M2014-01681-CCA-R3-CD, 2015 WL 3989127, at *3 (Tenn. Crim. App. June 30, 2015) *no perm. app. filed* (quoting *State v. Wendell Gary Gibson,* No. M2001-01430-CCA-R3-CD, 2002 WL 1358711, at *2 (Tenn. Crim. App. June 24, 2002)). An order of restitution may not be based on arbitrary estimates. *Jerry Lee Truette*, 2006 WL 2000540, at *4.

In *State v. David Allan Bohanon*, two victims testified to their losses by theft. While the victims' testimony regarding specific stolen items, accompanied by the victims' estimation of the value of the items, was held to be sufficient evidence to uphold the restitution award, this court concluded that the testimony of one victim that he was missing tools valued at $10,000 was insufficient to sustain the award as to that loss. *David Allan Bohanon*, 2013 WL 5777254, at *7. In reversing the award, this court noted that the victim had at first testified the tools were worth $50,000 and that he provided no specific evidence regarding which tools were missing, merely stating that they were "expensive" and "everything a mechanic would need." *Id.* We concluded that this testimony was insufficient to allow the trial court to make a reasonable or reliable determination of value. *Id.*

In *State v. Bottoms*, this court likewise found the amount of restitution unsubstantiated. *Bottoms*, 87 S.W.3d at 108 (conducting de novo review). The victim in *Bottoms* testified that he completed repairs after an arson and that $28,000 was a "relatively" accurate assessment of the cost. *Id.* at 107. He provided an estimate from a contractor for approximately $28,000 worth of repairs, but only provided an invoice for approximately six thousand dollars of repairs and testified that he had completed many

repairs himself and had not brought his other bills. *Id.* at 107. This court concluded that the victim's actual loss was "uncertain[]" and that the trial court could not determine the loss with reliability. *Id.* at 109. Despite the fact that the $10,000 restitution had been set far below the amount of pecuniary damages, this court reversed and remanded for a new determination of the value of the loss. *Id.*

In *State v. Smith*, the appellate court concluded that the estimates of the victim's loss were not adequately proven. *Smith*, 898 S.W.2d at 747. While the victim provided an estimate regarding the value of the destroyed residence, the value of its contents, and the amount that the insurance company paid, the victim did not provide an "explanation as to how these figures were calculated," and there was a possibility that the values were "highly inflated." *Id.* A victim's testimony regarding the amount for which the property was purchased years ago was also held to be insufficient to sustain the award of restitution, because the value at the time of the offense was not established. *State v. John Edward Lewis*, No. M2014-01912-CCA-R3-CD, 2015 WL 3541424, at *3 (Tenn. Crim. App. June 5, 2015) *no perm. app. filed*.

In *State v. Emily Brittany Davis*, on the other hand, this court concluded that the testimony of the victim, which included statements regarding how he calculated damages, specifying that the total included repairs by a mechanic and the cost of a temporary license tag, was sufficient to support the amount of restitution. *Emily Brittany Davis*, 2015 WL 5564204, at *2-3. Likewise, a victim's unchallenged testimony regarding the extent of lost wages was held to be sufficient to establish the amount of loss. *Johnson*, 968 S.W.2d at 886; *State v. John N. Moffitt*, No. W2014-02388-CCA-R3-CD, 2016 WL 369379, at *6 (Tenn. Crim. App. Jan. 29, 2016), *perm. app. denied* (Tenn. June 24, 2016) (concluding that testimony regarding wages lost due to a specific contract the victim was unable to perform was adequate to establish lost wages without documentation). A victim's itemized estimates as to the value of antique furniture were found sufficiently reliable to sustain the restitution award, as they were based on family evaluations and were "not arbitrary." *Jerry Lee Truette*, 2006 WL 2000540, at *4.

*State v. Keisha M. Howard* presented, like the case at bar, an instance of theft by an employee. *State v. Keisha M. Howard*, No. E2011-00598-CCA-R3-CD, 2012 WL 3064653, at *11 (Tenn. Crim. App. July 30, 2012). The prosecution introduced exhibits detailing the exact amounts missing, including $17,856.94 from cash deposits, $97,842.48 from cruise bookings, $30,213.00 cash from vacation bookings, and an unpaid balance of $11,038.88 on trips taken by the employee. *Id.* The State also introduced documentation that the employee had made significant cash deposits into her bank during the period of the theft, a note from the employer's clients stating that they had given the company money that was unaccounted for, and an itemization of the

-14-

defendant's trips. *Id.* This court concluded that the proof was sufficient to sustain restitution for the amount of loss summarized in the exhibit. *Id.* at *12.

Here, the State presented the testimony of two of the victim's employees regarding the approximate amounts of loss. The employees testified that the Defendant made fraudulent credit card charges totaling $330,000; that she was overpaid by approximately $31,000 in 2008; that she took approximately $20,000 through forged checks; and that the company spent $50,000 investigating her. Ultimately $25,000 of the credit card charges were forgiven by the credit card company. The employees estimated that the total loss to the company was $372,000. While both employees testified that they went through the records meticulously, only included charges which were undoubtedly fraudulent, and had their work verified by an accountant, we conclude that the testimony was insufficient to sustain the finding of the value of the loss.

First, we note that the origin of the figure $372,000 is completely unclear given the more specific testimony regarding categories of loss. The estimates of the losses from fraudulent credit card charges, forged checks, and payroll theft do not add up to $372,000. The fact that the loss is valued in round number increments further indicates that these are mere estimates. The employees testified that they were estimating from memory, as they had given the documentation of the loss to the prosecution. It is not clear whether the $50,000 spent to investigate the fraud was included in the total, and the trial court made no finding regarding the reasonableness of the figure. *See* T.C.A. § 40-35-304(e)(2) (allowing only "[r]easonable out-of-pocket expenses" incurred by filing charges or cooperating in the investigation). There was an inadequate "explanation as to how these figures were calculated," *Smith*, 898 S.W.2d at 747, and we conclude that the trial court could not reliably find the amount of the loss. While the witnesses testified that their calculations regarding the loss were documented in a binder which was in the possession of the State, the State introduced neither the binder, the verification of the amount by the accounting firm, nor any summary of the work done to calculate the loss.

We further note that the forgiven $25,000 cannot be factored into the loss sustained by the victims, but it is unclear if this amount was included. When a victim's loss has already been compensated, the trial court may not consider it for the purpose of restitution. In *State v. John N. Moffitt*, the victim had incurred over $25,000 in medical bills, but the hospital bill showed that he had been forgiven all but approximately $1,000. *John N. Moffitt*, 2016 WL 369379, at *5. This court concluded that while the award of restitution could be upheld where the forgiveness of the debt was only an "expectation," a victim whose debt had already been forgiven could not be awarded restitution of that amount. *Id.* at *6.

-15-

We conclude that the State presented inadequate proof regarding the victim's losses. In *State v. Bottoms*, the appellate court concluded that the proof of loss was unreliable and uncertain. *Bottoms*, 87 S.W.3d at 108. While the restitution amount of $10,000 was far below the claimed value of the loss of $28,000, this court nevertheless reversed and remanded for a new determination regarding the value of the loss. *Id.* at 109. We conclude that in this case, we must likewise reverse and remand, although the restitution amount of $100,000 is far below the claimed value of the loss at $372,000.

## CONCLUSION

Because the State failed to introduce adequate proof of the loss, we reverse the restitution award and remand for further proceedings.

_____
JOHN EVERETT WILLIAMS, JUDGE