IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 19, 2018

## STATE OF TENNESSEE v. CHRISTOPHER C. SOLOMON

**Appeal from the Criminal Court for Sumner County**
**No. 832-2016        Dee David Gay, Judge**

_____

### No. M2018-00456-CCA-R3-CD

_____

The Defendant, Christopher C. Solomon, entered an open guilty plea to aggravated vehicular homicide, aggravated vehicular assault, and leaving the scene of an accident. Following a sentencing hearing, the trial court imposed an effective sentence of thirty-three years and imposed a restriction banning the Defendant from driving for life. On appeal, the Defendant contends that the trial court imposed an excessive sentence and erred in imposing a lifetime ban from driving. We conclude that the Defendant's sentence is not excessive but that the trial court erred in imposing the lifetime driving ban. Accordingly, we remand for entry of a corrected judgment for the Defendant's aggravated vehicular homicide conviction to reflect that the Defendant's license is to be revoked in accordance with Tennessee Code Annotated section 55-50-501(a)(1). We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

David Allen Doyle, District Public Defender; and Mike Anderson, Assistant District Public Defender, for the appellant, Christopher C. Solomon.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Bryana Landers Grant, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

On a Saturday afternoon in October 2016, the Defendant struck the victims, Mr. Robert Pyles and Ms. Dineen Cottrell, with his car while intoxicated and then fled the scene. Mr. Pyles died as a result of his injuries, and Ms. Dineen Cottrell sustained serious injuries. The Defendant was charged with aggravated vehicular homicide while having at least two prior convictions for driving under the influence ("DUI"), a Class A felony; aggravated vehicular assault while having at least two prior DUI convictions, a Class C felony; and leaving the scene of an accident resulting in death, a Class E felony. *See* T.C.A. §§ 39-13-115(b)(1), (e); 39-13-218(a)(1), (d); 55-10-101(a), (b)(2)(A). The Defendant entered guilty pleas to the charges with the sentences to be determined by the trial court.

During the guilty plea hearing, the State summarized the factual basis for the pleas, including the fact that the Defendant struck the victims and then fled the scene. The responding officers located the Defendant behind the wheel of his car. The damage to the hood and windshield of the car was consistent with witnesses' statements regarding how the accident occurred. Officers transported the Defendant to the Hendersonville Police Department where he was interviewed.

During the interview, the Defendant was lethargic, sweating profusely, unable to keep his eyes open, moving his head back and forth, and licking his lips as if his mouth was dry. When the police officer asked the Defendant what he had taken, the Defendant made several unintelligible responses. Finally, the officer was able to determine that the Defendant had taken Percocet earlier that day. The Defendant stated that he did not remember hitting anyone and that he believed he had hit a deer or a mailbox. The officer attempted to conduct a horizontal gaze nystagmus test, but the Defendant was unable to follow the officer's pen and continued to stare forward. When the officer left the room to obtain an implied consent form for a blood draw, the Defendant fell asleep and fell out of his chair.

The Defendant consented to a blood draw. The results of the blood test revealed 64 nanograms per milliliter of alprazolam, less than 0.05 micrograms per milliliter of amphetamine, and 447 nanograms per milliliter of benzoylecgonine. The Defendant had two prior DUI convictions, one in December 2013 and the other in May 2015. The trial court accepted the Defendant's guilty pleas.

**Sentencing Hearing**

Hendersonville Police Officer Chris Rapp offered testimony regarding additional details of the circumstances of the accident. Officer Rapp, a member of the Crash Reconstruction Team, received a call about the accident on Saturday, October 15, 2016, at 1:44 p.m. He was told that the victims were walking to a yard sale near their home when the Defendant struck them from behind with his car and fled the scene. The responding officers located the Defendant less than one-half mile away sitting in his car and eating grapes. The Defendant told the officers that as he was driving over a hill, the sunlight prevented him from seeing clearly, that he believed he struck either a mailbox or an animal, and that he left the scene because he was frightened. The officers took the Defendant into custody and transported him to the police department where Officer Rapp interviewed him.

When Officer Rapp arrived at the police department, the Defendant was sitting in the interview room with his head down and appeared to be sleeping. Following the interview, Officer Rapp transported the Defendant to the hospital to obtain a blood sample. The Defendant was lethargic and fell asleep on the hospital bed following the blood draw while Officer Rapp was completing paperwork. The Defendant also fell asleep in the patrol car as he was being transported to be booked.

Upon learning that Mr. Pyles passed away, Officer Rapp and Detective Jeff Brewer prepared a new arrest warrant charging the Defendant with vehicular homicide. They interviewed the Defendant again, but the Defendant continued to be lethargic even though the interview took place approximately four and one-half hours after the accident. The Defendant told the officers that he had taken Xanax. The officers again questioned the Defendant the following day, and Officer Rapp believed that the Defendant told them that he had taken "a bar of Xanax."

Officer Rapp went to Skyline Medical Center to see Ms. Dineen Cottrell, who was unconscious and on a breathing tube. She had head trauma and abrasions that were consistent with road rash and striking the ground after being struck by a vehicle. Officer Rapp learned that Mr. Pyles had sustained a skull fracture on the back of his head and road rash on his arms, back, and the top of his feet.

On the day following the accident, Officer Rapp and Detective Brewer went to the secured lot where the Defendant's car was stored and observed damage that was consistent with a body striking the hood of the car. Officer Rapp identified "spider webbing" on the windshield where Ms. Dineen Cottrell's head made contact, and he recovered some of Ms. Dineen Cottrell's hair on the glass around the "spider webbing." Officer Rapp also identified a hole in the windshield where Mr. Pyles went through the

windshield and into the car. Mr. Pyles's head and the left side of his face struck the top of the Defendant's car. The officers recovered Mr. Pyles's blood and hair on the car.

Officer Rapp made a video recording of his driving through the scene around the same time of day at which the accident occurred and stated that the sun was located almost directly overhead and did not interfere with his ability to see in either direction. Officer Rapp determined that the final resting place of Ms. Dineen Cottrell and Mr. Pyles from the point of impact was 68.74 feet and 63 feet, respectively. Although Officer Rapp did not conduct a complete reconstruction regarding speed, he estimated that based on his experience and the location at which the victims were found, the Defendant was traveling between thirty to forty miles per hour in a twenty-five-mile-per-hour speed zone when he struck the victims.

Special Agent Jeff Crews, the forensic supervisor for the Tennessee Bureau of Investigation's ("TBI") crime laboratory in Nashville, was accepted by the trial court as an expert in forensic toxicology. Special Agent Crews testified about the results of the toxicology testing of the Defendant's blood sample by former Special Agent Samantha Englehart, who had left the TBI to move closer to family in the northeast. Special Agent Crews and another forensic scientist reviewed the testing of the Defendant's blood sample, and Special Agent Crews had no concerns about Special Agent Englehart's performance and no reason to believe that she failed to follow protocol in testing the blood.

Special Agent Crews testified that the Defendant's blood was positive for alprazolam, which is commonly referred to as Xanax. He stated that although the amount in the Defendant's system was within the therapeutic range, the purpose of the drug is to suppress the central nervous system, and a therapeutic amount would still cause such side effects as drowsiness and/or confusion. Special Agent Crews said the second drug in the Defendant's blood was amphetamine, which could be from Adderall, a medication for attention deficit disorder, or could be from breakdown of methamphetamine. The amount of amphetamine in the Defendant's blood was within the therapeutic range for Adderall. Special Agent Crews stated that while Adderall has a stimulating effect on the body and is proscribed to increase a person's ability to focus, it can cause confusion and nervousness. He also stated that the Xanax and the amphetamine did not cancel each other out and that some of the effects of both drugs, such as dizziness, drowsiness, and nervousness, may still be present. The third drug in the Defendant's blood was benzoylecgonine, an inactive metabolite from cocaine. Special Agent Crews stated that the lowest threshold for detection of benzoylecgonine was fifty nanograms and that the Defendant had 447 nanograms in his blood.

Ms. Dineen Cottrell testified that at the time of Mr. Pyles's death, they had been married for approximately five years and that she had known him since the age of seventeen. Mr. Pyles helped her raise her daughter, Ms. Summer Cottrell. Ms. Dineen Cottrell testified regarding the activities that they enjoyed doing together and the void in her life since Mr. Pyles's death. She had no memory of the accident, and her last memory before the accident was of a wedding that she and Mr. Pyles attended two weeks prior to the accident. She had no memory from October 2016 until January 2017 when she was in a rehabilitation center, the fourth healthcare facility to which she had been admitted since the accident. She remained in a wheelchair until the end of February 2017 and continues to use a walker on occasion. During her recovery, Ms. Dineen Cottrell asked about Mr. Pyles often. She said that when she was told of his passing, she did not believe she had the mental ability to comprehend it. Due to her condition, she was unable to attend Mr. Pyles's funeral.

Prior to the accident, Ms. Dineen Cottrell was an operating room technician at Vanderbilt Hospital and was a member of a specialized surgical team. As a result of the accident, she can no longer drive a car, use the stairs, lift objects, or work. She feared losing her home due to the lack of income, and medical bills are a "permanent fixture" in her life. Her family did not want her to live alone, and she felt as if she was losing her "independence and being forced into infancy again." She requested that the Defendant receive the maximum sentence.

Ms. Summer Cottrell testified that prior to the accident, she was living with the victims, attending college, and working at Sonic. She turned eighteen years old approximately one month after the accident. She said the accident forced her to mature quickly. She has not returned to college since the accident and works two jobs to pay the bills. Her mother had a large number of medical bills, and her health insurance expenses have risen significantly since the accident. Ms. Summer Cottrell stated that she would have been unable to pay the bills but for an account set up by her high school teachers.

Ms. Summer Cottrell testified regarding the victims' relationship with each other and her relationship with Mr. Pyles. She discussed the grief that she had experienced upon learning of Mr. Pyles's death and the episodes of grief that she continued to experience. She said she wanted to hold Mr. Pyles's hand and tell him goodbye, but she was unable to do so. She also said she contemplated suicide often, but she knew that she could not leave her mother alone.

Ms. Summer Cottrell testified regarding her mother's recovery and treatment. Ms. Dineen Cottrell remained unconscious for eight days. Her doctor told her family that she had a diffuse axonal injury, that her chances of waking up were remote, and that her quality of life would be poor if she did awaken. Ms. Dineen Cottrell was unable to track

a finger or blink on command until approximately three weeks after the accident and was unable to speak for approximately two months. During her recovery, she was extremely agitated, would scream, and would attempt to throw herself out of her hospital bed. Her arms and legs had to be strapped down. Ms. Dineen Cottrell was unable to recognize her daughter at times and maintained a "blank stare." Her eyes were no longer in line due to a skull fracture. Once Ms. Dineen Cottrell was released and able to return home, her daughter drove her to therapy in Nashville three times a week.

Ms. Summer Cottrell recalled that her mother asked about Mr. Pyles for months during her hospitalization but that everyone avoided the topic because her mother would either forget or be unable to process news of his death. Once Ms. Dineen Cottrell was transferred to the last hospital prior to her release, she noticed that Mr. Pyles had not visited her and believed that Mr. Pyles no longer loved her. When Ms. Summer Cottrell told her about Mr. Pyles's death, Ms. Dineen Cottrell did not believe her.

Ms. Dineen Cottrell confessed to her daughter that she had contemplated suicide. Ms. Summer Cottrell said that one night, she found her mother in the kitchen holding a knife to her wrists. Ms. Summer Cottrell and her aunt took Ms. Dineen Cottrell to a hospital, where she remained for approximately one week.

Numerous other friends and family members testified and presented letters about the victims, their lives before the accident, the impact of the loss of Mr. Pyles on his family, and the impact of Ms. Dineen Cottrell's injuries.

The State also presented proof regarding the Defendant's criminal history. The State presented certified judgments of the Defendant's prior convictions for DUI in Nevada in 2008, DUI second offense in Nevada in 2009, theft of property valued at less than $500 in 2012, DUI second offense in 2012, solicitation to file a false report in 2013, DUI second offense in 2013, public intoxication in 2015, vandalism of property valued at less than $500 in 2015, shoplifting in 2015, theft of property valued at less than $500 in 2016, and possession of a Schedule IV controlled substance in 2016. The Defendant's probation had been revoked on multiple occasions.

Mr. Carson Bumbalough, a probation officer who supervised those enrolled in the DUI Court Program in Sumner County, testified that the Defendant entered the program in December 2013 and successfully completed the program. Prior to entering the program, the Defendant had a prior DUI conviction for which he received probation and treatment for alcohol/drug dependence. While enrolled in the program, he received inpatient treatment for alcohol abuse and attended meetings to address drug and alcohol abuse. He used pills and had drug screens that were positive for amphetamine. Mr. Bumbalough said those issues were addressed within the program. He also said the

Defendant was the only graduate of the program who had later been convicted of vehicular homicide.

In August 2015, the general sessions court revoked the Defendant's probation as a result of new charges for shoplifting, vandalism, and public intoxication, and the court ordered him to serve eleven months and twenty-nine days in confinement. The Defendant "flattened" his sentence while incarcerated. He was placed on probation in May 2016 after he was convicted of possession of a Schedule IV controlled substance and theft. He was on probation when he committed the offenses in the instant case, and his probation was revoked as a result.

The trial court questioned Mr. Blake Mohamed, the probation officer who prepared the Defendant's presentence report, regarding the risk and needs assessment attached to the report, which stated that the Defendant's overall risk to reoffend was low. Mr. Mohamed testified regarding the various categories considered in the assessment and the results produced by the Defendant's responses. He stated that the category assessing the Defendant's family connections returned a result of low risk to reoffend, "beginning to encroach on moderate" risk, even though the Defendant did not have any contact with his daughter and was unsure where his former wife and his daughter were located. Mr. Mohamed also stated that the Defendant's alcohol and drug use category "is encroaching on moderate" risk based on the Defendant's past alcohol and drug use. The trial court noted that all other evidence introduced at sentencing led to the conclusion that the Defendant's alcohol and drug use was "excessive." The trial court confirmed with director of the probation office in Sumner County that the assessment was required by law to be included in the presentence report and asked the director to report to the Department of Correction that the assessment is "slanted and bogus."

In response to questioning by the State, Mr. Mohamed testified that the information in the assessment was based upon the Defendant's responses to questions that elicited "yes or no" responses. The assessment had since been updated to allow for more specific answers. Mr. Mohamed did not know how each section was weighed in assessing the Defendant's risk to reoffend and said he merely received a printout of the assessment once the answers were submitted. When Mr. Mohamed interviewed the Defendant in preparing the presentence report, the Defendant only stated that he reserved the right to make a statement during the hearing.

The Defendant made an allocution during which he apologized for his conduct, maintained that he never intended to hurt anyone, and asked for forgiveness.

In sentencing the Defendant, the trial court considered the evidence presented at the hearing, the presentence report, the sentencing principles, the Defendant's arguments,

the circumstances of the offenses, the statistical information provided by the Tennessee Administrative Office of the Courts ("AOC"), and the Defendant's allocution. The trial court noted that it must also consider whether the imposition of the sentence is justly deserved in relation of the seriousness of the offenses, whether the punishment is sufficient to deter crime and promote respect for the law, and the Defendant's potential for rehabilitation. The trial court stated that while it considered the risk and needs assessment, it was "irrelevant" and "about as worthless and insensitive to what happened here as you can get."

The trial court applied the following enhancement factors to each conviction: (1) the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and (13) the Defendant was released on probation when he committed the offenses. *See* T.C.A. § 40-35-114(1), (13). As to the Defendant's conviction for leaving the scene of an accident, the trial court also applied as an enhancement factor that the offense involved more than one victim. *See* T.C.A. § 40-35-114(3). The trial court considered the Defendant's college degree and employment history as mitigating factors.

In examining the circumstances of the offenses, the trial court stated that the Defendant drove in the daytime while under the influence and that he was so intoxicated that he was unable to stay awake, was unaware of what had occurred, drove away from the scene, and was located in his parked car eating grapes approximately one block away from the scene. The trial court stated that Mr. Pyles died as a result and that Ms. Dineen Cottrell was in a coma and could have died. The trial court found that the Defendant's conduct affected generations of the victims' family and that the victims' family unit was "totally wiped out."

The trial court found that the Defendant's four prior DUI convictions had not deterred him from driving while intoxicated. The trial court reviewed the Defendant's extensive criminal history and found that the Defendant's potential for rehabilitation was "slim to none."

The trial court noted that the parties agreed that the Defendant was a Range I, standard offender. The trial court imposed the maximum sentences of twenty-five years at sixty percent for the aggravated vehicular homicide conviction, six years at thirty percent for the aggravated vehicular assault conviction, and two years at thirty percent for the fleeing the scene conviction. Upon finding that the Defendant had an extensive record of criminal activity, the trial court ordered the Defendant to serve his sentences consecutively to each other and to a sentence from a prior conviction in general sessions court for an effective sentence of thirty-three years in confinement. The trial court also banned the Defendant from driving a vehicle for the remainder of his life.

**ANALYSIS**

The Defendant maintains that the trial court failed to sentence him in accordance with the Criminal Sentencing Reform Act of 1989 and that, as a result, this court should apply a de novo review. Specifically, he contends that the trial court erred in (1) allowing Special Agent Crews to testify about the blood analysis report and the effects of the drugs listed in the report; (2) considering the statistical information from the AOC when the information is not in the record; (3) failing to appropriately consider the risk and needs assessment; (4) finding that the Defendant had a low potential for rehabilitation; and (5) ordering him to never drive again. The State responds that the trial court did not abuse its discretion in its sentencing considerations and findings, but the State concedes that the trial court erred in imposing the lifetime ban from driving. We agree with the State.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices

- 9 -

for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment contained in the presentence report. T.C.A. § 40-35-210(b) (Supp. 2017). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As a Range I standard offender, the Defendant was subject to a sentence of fifteen to twenty-five years for aggravated vehicular homicide, a Class A felony, a sentence of three to six years for aggravated vehicular assault, a Class C felony, and one to two years for leaving the scene of an assault resulting in death, a Class E felony. *See* T.C.A. §§ 39-13-115(b)(1), (e); 39-13-218(a)(1), (d); 40-35-112(a); 55-10-101(a), (b)(2)(A). The trial court imposed the maximum sentence within the range for each conviction.

The Defendant contends that the trial court erred in entering the TBI report of his blood test results into evidence and allowing Special Agent Crews to testify regarding those results when Special Agent Crews did not perform the testing. The Defendant maintains that pursuant to Tennessee Code Annotated section 55-10-408(d), the admissibility of the report was conditioned upon the person who performed the test either testifying or submitting to a deposition. *See* T.C.A. § 55-10-408(d) (providing for the admissibility of the report when attested by the director of the TBI or the director's representative "if the person taking or causing to be taken the specimen and the person performing the tests of the specimen shall be available, if subpoenaed as witnesses, upon demand by either party to the cause, or, when unable to appear as witnesses, shall submit a deposition upon demand by either party to the cause"). The trial court, however, found that the report was reliable hearsay, noting that Special Agent Crews was a supervisor who examined the report and determined the tester followed the appropriate protocol. *See* T.C.A. § 40-35-209(b) (providing that during a sentencing hearing, "reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted"). On appeal, the Defendant does not challenge the trial court's finding that the report constituted reliable hearsay nor does he maintain that he did not have a fair opportunity to rebut the evidence. Furthermore, the results of the blood tests were included in the presentence report, and the Defendant does not challenge the admission of the presentence report on appeal. *See State v. Jamie Paul Click*, No. E2015-01769-CCA-R3-CD, 2017 WL 1189750, at *19 (Tenn. Crim. App. Mar. 30, 2017) ("It is well established that reliable hearsay, such as a presentence report, is admissible during sentencing."), *perm. app. denied* (Tenn. Aug. 16, 2017); *see also* T.C.A. § 40-35-210(b)(2) (requiring the trial court to consider the presentence report before imposing a sentence). The State also included the results of the blood test as part of the factual basis

of the plea during the plea hearing, and the Defendant did not challenge or otherwise disagree with the factual basis set forth by the State. Accordingly, the Defendant has failed to establish that the trial court erred in considering such evidence in imposing the sentences.

The Defendant contends that the trial court erred in allowing Special Agent Crews to testify about the effect of the drugs in the Defendant's blood and in considering statistics from the AOC when the statistics were not included in the record. The Defendant, however, has waived these issues on appeal by failing to cite to any authority to support his claims. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

The Defendant next claims that the trial court failed to consider the risk and needs assessment as required by Tennessee Code Annotated section 40-35-210(b)(8) and that the trial court erred in finding that the Defendant's potential for rehabilitation was low. As part of the Public Safety Act of 2016, section 40-35-207 was amended to require the results of a "validated risk and needs assessment" be included in the presentence report. *See* T.C.A. § 40-35-207(a)(10) (Supp. 2017). A "validated risk and needs assessment" is "a determination of a person's risk to reoffend and the needs that, when addressed, reduce the risk to reoffend through the use of an actuarial assessment tool designed by the department that assesses the dynamic and static factors that drive criminal behavior." T.C.A. § 40-35-207(d) (Supp. 2017). Section 40-35-210(b) lists the risk and needs assessment as one of the sources that a trial court must consider in determining a defendant's sentence. However, the statute does not mandate that any particular weight be given to the risk and needs assessment, and we conclude that the weight to be assigned to the assessment falls within the trial court's broad discretionary authority in the imposition of sentences. *See Bise*, 380 S.W.3d at 708.

The record reflects that the trial court considered the assessment in determining the Defendant's sentence but declined to give it any weight. This determination was not only within the trial court's discretion but is clearly supported by the evidence presented at the sentencing hearing. We share the trial court's bewilderment as to how the Defendant falls within a slightly moderate risk in the alcohol/drug use category when he has amassed four DUI convictions and other drug- and alcohol-related convictions, has undergone multiple failed attempts at rehabilitation, has continued to use drugs, and ran over two people in broad daylight while so intoxicated that he was unable to stay awake. The assessment's conclusion that the Defendant had a low risk of reoffending is entirely inconsistent with evidence that the Defendant accumulated a large number of convictions within a relatively short period of time, had his probation revoked on multiple occasions, and was on probation when he committed the instant offenses. Despite being afforded multiple opportunities for rehabilitation, the Defendant has continued to reoffend. We conclude that the trial court acted within its discretion in declining to give any weight to a

- 11 -

computer-generated report derived from the Defendant's "yes" or "no" answers to a series of standardized questions and instead basing its decision on the other factors set forth in section 40-35-210(b). We further conclude that the evidence presented at the sentencing hearing, including the Defendant's prior criminal record, supports the trial court's finding that the Defendant's potential for rehabilitation was low.

The trial court did not abuse its discretion in imposing the within-range sentences and aligning them consecutively. The trial court considered the purposes and principles of sentencing, and the Defendant has not demonstrated that the aggregate sentence resulted from the application of an incorrect legal standard, an illogical conclusion, a clearly erroneous assessment of the evidence, or reasoning which has perpetuated an injustice. Accordingly, the Defendant's sentences are affirmed.

Finally, the Defendant contends that the trial court erred in imposing a lifetime ban from driving. The State concedes error and maintains that ten years is the maximum amount of time that the trial court could ban the Defendant from driving pursuant to Tennessee Code Annotated section 39-13-213(c). This statute provides, "The court shall prohibit a defendant convicted of vehicular homicide from driving a vehicle in this state for a period of time not less than three (3) years nor more than ten (10) years." The Defendant was not convicted of vehicular homicide but was convicted of aggravated vehicular homicide. Section 39-13-218, which sets forth the offense of aggravated vehicular homicide, does not address the status of a defendant's license upon conviction. *Cf.* T.C.A. § 39-13-115(b), (f) (defining aggravated vehicular assault and providing that "[u]pon conviction for aggravated vehicular assault, the court shall prohibit the convicted person from driving a vehicle in this state pursuant to § 39-13-106(c) [the vehicular assault statute]"). Rather, section 55-50-501(a)(1) requires the revocation of a defendant's license upon conviction for:

> Manslaughter resulting from the operation of a motor vehicle. The period of revocation in this instance shall extend for the term of the sentence received by the convicted person. If the person is released on parole prior to the end of the sentence, an operator's license may be reissued on petition of the person's probation and parole officer and upon satisfactory completion of a complete licensing examination, subject to the approval of the commissioner. In the case of a conviction for vehicular homicide, the department shall revoke the license for the period of time the court prohibited the person from driving a vehicle pursuant to § 39-13-213(c).

Accordingly, we remand entry of a corrected judgment of the Defendant's aggravated vehicular homicide conviction to reflect that the Defendant's license is to be revoked for

a period that shall extend for the term of the Defendant's sentence pursuant to section 55-50-501(a)(1).

## CONCLUSION

We affirm the judgments of the trial court. We remand for entry of a corrected judgment for aggravated vehicular homicide to reflect that the Defendant's driver's license is to be revoked for the terms of the Defendant's sentence in accordance with Tennessee Code Annotated section 55-50-501(a)(1).

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE