IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2019

**STATE OF TENNESSEE v. DETRICK TURNER**

**Appeal from the Criminal Court for Shelby County**
No. 14-03220     Lee V. Coffee, Judge

_____

**No. W2018-00726-CCA-R3-CD**

_____

The Defendant, Detrick Turner, was convicted of second degree murder and was sentenced to twenty-two years of incarceration. On appeal, the Defendant asserts that his sentence is excessive. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Monica Timmerman (at trial), James Jones (at trial), Jessica L. Gillentine (at trial and on appeal), and Gerald S. Green (on appeal), Memphis, Tennessee, for the Appellant, Detrick Turner.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jeff Jones and Alyssa Hennig, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial established that during the early morning hours of February 21, 2014, the Defendant killed his wife, Mrs. Sharice Turner, by shooting her in her face with his .40 caliber handgun. The Defendant was charged with first degree premeditated murder. The Defendant's defense at trial was that the shooting was accidental. The jury convicted the Defendant of second degree murder as a lesser

included offense of first degree premeditated murder. Because the Defendant only challenges his sentence on appeal, we give only a brief summary of the evidence presented at trial.

Ms. Paula Cowan, the Defendant's neighbor, testified that she and her boyfriend, Mr. Marcus Jefferies, were awakened by their outdoor motion detector, and they saw the Defendant walking around their yard. Mr. Jefferies looked at his cell phone and saw that he had a missed call from the Defendant. He called the Defendant, who stated, "I can't get Shari up." Ms. Cowan met the Defendant in her driveway and walked with him to his home next door. While standing in the Defendant's front yard, Ms. Cowan asked him what had occurred. The Defendant replied, "Nothing. I can't get Shari up." Ms. Cowan described the Defendant as "calm." The Defendant said he did not want his children to see the victim "like that," so he returned to his home and brought his two children outside. Ms. Cowan escorted the children to her home where Mr. Jefferies watched them while she returned to the Defendant's home. When Ms. Cowan entered the Defendant's home, he was talking on his cell phone, and she heard him say, "Bro, call me back. Me and Shari got into it, and the gun went off and hit her upside the head." The Defendant then called 9-1-1 and remained on the line with the operator until police officers arrived.

Ms. Cowan walked into the den where she saw the victim, who appeared to be sleeping on the couch. The victim's chair was reclined, her legs were elevated, a blanket was covering her, and she was turned to the side with her right arm tucked under a pillow. Blood was coming from the victim's mouth, and Ms. Cowan determined that the victim did not have a pulse. Ms. Cowan told the Defendant, who began to "panic." He stated that "[i]t ain't supposed to happen like this," and that "[i]t was a mistake." Ms. Cowan saw a gun lying on the couch next to the victim. She explained that because the Defendant was pacing and she did not want him to hurt himself, she picked up the gun and placed it in a box on top of the garbage can. The Defendant noticed that the gun was missing and asked Ms. Cowan where it was. When she told him where she had put the gun, he said she did not have to move it and that he wanted the police officers to see where the gun was located. The Defendant retrieved the gun and tossed it back on the couch. He became "hysterical" and began grabbing the victim and telling her to get up.

The Defendant and Ms. Cowan went outside once they heard sirens. Ms. Cowan described the Defendant as "calm" at that point. Memphis Police Officer William Forrester, one of the responding officers, saw the Defendant walking in the front yard while talking on his cell phone. Officer Forrester heard the Defendant say, "It was an accident." Once officers identified the Defendant as the shooter, they ordered him to lie down on the ground and raise his hands. The Defendant continued to talk on his cell phone, and the officers forced the Defendant on the ground and took him into custody.

Officer Forrester described the Defendant as "non-cooperative" and "slightly belligerent."

Memphis Police Officer Andrew Hurst later interviewed the Defendant, who stated that he had played dominoes with his friends on the night of the victim's death. When he returned home, he found the victim on the couch with his .40 caliber handgun. He stated that the victim held the gun and asked, "Is this what you're looking for?" The Defendant denied that the victim threatened him with the gun. He stated that while the victim had fired guns with him previously, she had never fired the handgun. He explained that he did not want her to have the handgun because it did not have a safety mechanism. He said that he attempted to take the handgun away from the victim and that they struggled over it. He stated that he grabbed the barrel of the handgun with both hands, while the victim held the gun by its grip. He stated that the handgun went up, fired a bullet into the wall, came back down, and fired again, striking the victim's face.

Officer Hurst testified at trial that he believed the Defendant's version of the shooting was impossible. Officer Hurst stated that a semi-automatic gun, such as the Defendant's .40 caliber handgun, would only fire one shot if someone was holding it by the slide and the barrel. Officer Hurst explained that in order to fire another shot, the slide must go back and then go forward so that another round could enter the chamber. He said the slide would be unable to "rack" another round if someone were holding the barrel of the gun. The Defendant denied that either he or the victim let go of the gun when it fired the first shot. He was "very calm" during the interview and displayed no signs of emotion. Once Officer Hurst told the Defendant that his story was not possible and did not match what officers found at the crime scene, the Defendant became "belligerent" and ended the interview.

The officers found no signs of a struggle inside the home. The officers recovered a .40 caliber handgun near the victim. They also recovered a spent cartridge casings behind the couch and another one near a bar in the living room area. A possible bullet hole was in the couch, and the spent bullet was recovered underneath the couch. The spent cartridge casings and bullet were determined to have been fired from the .40 caliber handgun. The handgun was examined by a firearms expert who found the handgun to be in normal operating condition with functioning safety features.

Dr. Marco Ross, a forensic pathologist, testified that the victim died as a result of a bullet that entered her left cheek and damaged her spinal cord. There were gunpowder stipple marks on the left side of the victim's face that extended into her left temple, which indicated that the muzzle of the gun was one-half of an inch to four feet away when the gun was fired.

The victim's toxicology report provided that she had alcohol and diphenhydramine, which is commonly found in Benadryl and some sleeping aids, in her system. The victim's blood alcohol level was .225%, which is approximately three times the .08% level provided in the statutes defining the offense of driving under the influence. The level of diphenhydramine in the victim's system was 733 nanograms per milliliter, which was approximately seven times the therapeutic level of fifty to one hundred nanograms per milliliter. Dr. Clint Richard Crooks, an expert in the field of forensic toxicology, testified that the level of alcohol in the victim's system would have affected her muscular coordination and her judgment and would have caused her to be lethargic and likely pass out. Dr. Crooks stated that the level of diphenhydramine would have had similar effects and that the combination of the alcohol and the medication would have worsened the effects.

During the sentencing hearing, the State presented the Defendant's presentence report, which stated that in June 2008, the Defendant was charged with a traffic offense and driving on a suspended, canceled, or revoked license and that both charges were dismissed. The Defendant made an allocution during which he took responsibility for his actions and apologized for his behavior. He maintained that the victim's death was accidental.

Defense counsel presented the testimony of Mr. John Crowder, the victim's father. He described the Defendant as a good father and son-in-law who helped him with various tasks. Mr. Crowder stated that the victim called him on multiple occasions and reported "violence was going on to her." Mr. Crowder also stated that the Defendant admitted beating the victim and threatened to "put two bullets in her head." Mr. Crowder denied telling defense counsel that it was difficult for him to believe that the victim's death was anything other than an accident. He asked the trial court to show the Defendant "mercy."

In sentencing the Defendant, the trial court stated that it considered the evidence presented at trial, the principles of sentencing, the evidence presented during the sentencing hearing, the Defendant's allocution, the statistical data provided by the Tennessee Administrative Office of the Courts, and the validated risks and needs assessment. The trial court found that the Defendant was a Range I, standard offender.

The trial court applied three enhancement factors: (1) the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" (5) the Defendant treated the victim "with exceptional cruelty during the commission of the offense;" and (9) the Defendant possessed or employed a firearm during the commission of the offense. T.C.A. § 40-35-114(1), (5), (9). In applying the prior history of criminal convictions or behavior enhancement factor, the trial court relied upon the Defendant's charges for driving

offenses in 2008 and gave "slight" weight to the enhancement factor. The trial court declined to consider Mr. Crowder's testimony regarding the Defendant's prior acts against the victim, noting that the incidents were never reported or investigated. The trial court gave "significant" weight to the Defendant's use of a firearm during the commission of the offense and his treating the victim with "exceptional cruelty." The trial court noted a significant problem in Shelby County with homicides during which firearms were used. The trial court found that the Defendant's statement to the police that the shooting was accidental was not credible. The trial court noted that the Defendant delayed calling 9-1-1 until he made calls to others and went to a neighbor's house and that he appeared "calm" and "indifferen[t]." In applying the "exceptional cruelty" enhancement factor, the trial court noted that it appeared that the victim was sleeping when the Defendant shot her in the head at close range and that there were no signs of a struggle. The trial court described the circumstances of the offense as "shocking" and "especially horrifying" and stated that it is "unconscionable when a woman loses her life at home at the hands of her husband when her children are sleeping in what should be a safe place."

The trial court considered as mitigating factors the Defendant's lack of prior felony convictions, his positive social and employment history, and the fact that he has two minor children. *See* T.C.A. § 40-35-113(13). The trial court also found that the Defendant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct" but gave the mitigating factor little weight. *See* T.C.A. § 40-35-113(11). The trial court found that the Defendant was not remorseful because he failed to accept responsibility for his actions. Accordingly, the trial court sentenced the Defendant to twenty-two years of confinement.

## ANALYSIS

The Defendant challenges his sentence as excessive. The State responds that the trial court properly exercised its discretion in imposing the within-range sentence. We agree with the State.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the

appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment contained in the presentence report. T.C.A. § 40-35-210(b) (Supp. 2017). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As a Range I, standard offender, the Defendant was subject to a sentence of fifteen to twenty-five years for second degree murder, a Class A felony. T.C.A. §§ 39-13-210(c)(1) (2014); 40-35-112(a)(1). The trial court imposed a within-range sentence of twenty-two years.

The Defendant contends that the trial court improperly considered Mr. Crowder's testimony regarding prior instances of violence committed by the Defendant against the victim. However, the trial court specifically stated that it did not consider the testimony in imposing a sentence, and the Defendant does not challenge the trial court's application of the prior criminal history enhancement factor. *See* T.C.A. § 40-35-114(1).

The Defendant includes a single sentence in his brief that "[t]he trial court appears to give great weight to the number of firearm crimes and deaths in Shelby County." It is

unclear whether the Defendant is claiming that the trial court erred or is merely making an observation based on his interpretation of the appellate record. Regardless, the trial court did not place significant weight upon the number of firearm crimes and deaths in Shelby County in imposing a sentence but placed significant weight on the Defendant's use of a firearm in killing the victim as an enhancement factor. *See* T.C.A. § 40-35-114(9). To the extent that the Defendant challenges the weight placed by the trial court on this enhancement factor, we note that a claim that the trial court improperly weighed the enhancement or mitigating factors is no longer a ground for appeal. *Carter*, 254 S.W.3d at 344.

The Defendant contends that the trial court erred in failing to give any weight to his allocution in which he maintained he was remorseful. The trial court considered the Defendant's statement as required by statute. *See* T.C.A. § 40-35-210(b)(7) (requiring the trial court to consider "[a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing"). However, the trial court determined that the Defendant's claim that the victim's death was accidental was not supported by the evidence, that he failed to accept responsibility for his actions, and that he, therefore, was not remorseful. "It is the role of the trial court to assess the credibility and demeanor of the defendant during the allocution and then make a determination as to remorse." *State v. Patrick Wayne Evans*, No. M2015-00897-CCA-R3-CD, 2016 WL 3992524, at *10 (Tenn. Crim. App. July 21, 2016). The trial court did not err in this regard.

Finally, the Defendant challenges the trial court's application of the "exceptional cruelty" enhancement factor. *See* T.C.A. § 40-35-114(5). Even if the trial court erred in applying this enhancement factor, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Nothing in the record suggests that the trial court "wholly departed from" the Sentencing Act. Rather, the record reflects that the trial court considered all relevant sentencing principles, including the enhancement and mitigating factors, when imposing the sentence. Therefore, we conclude that the trial court properly exercised its discretion in imposing the within-range sentence.

**CONCLUSION**

Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE